845 F.2d 1576
 Mary MESAROS and Anthony C. Mesaros, Plaintiffs-Appellants,
v.
The UNITED STATES of America, the United States Department
of the Treasury, Bureau of the Mint, James Baker, Secretary
of the Treasury and Donna Pope, Director of the United
States Mint, Defendants-Appellees.
 No. 88-1012.
 United States Court of Appeals,
Federal Circuit.
 May 6, 1988.
 
 Elizabeth F. Bunce, of Middleton & Anderson, Savannah, Ga., argued, for plaintiffs-appellants.
 Torrence R. Thomas, Jr., of the Dept. of Justice, Washington, D.C., argued, for defendants-appellees. With him on the brief, were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, and Robert A. Reutershan, of the Dept. of Justice, Washington, D.C. Of counsel was Randy Sim, Office of the General Counsel, Dept. of the Treasury, Washington, D.C.
 Before MAYER, Circuit Judge, and SKELTON and BALDWIN, Senior Circuit Judges.
 SKELTON, Senior Circuit Judge.
 
 
 1
 On May 23, 1986, plaintiffs Mary Mesaros and husband Anthony C. Mesaros filed a class action lawsuit for themselves and others similarly situated (thirty-three of whom were named) in the United States District Court for the Southern District of Georgia, Savannah Division, against the United States of America, the United States Department of the Treasury, the Bureau of the Mint, James Baker, Secretary of the Treasury, and Donna Pope, Director of the United States Mint (defendants) seeking damages for an alleged breach of contract by defendants in failing to deliver a quantity of Statue of Liberty commemorative coins they had ordered from defendants pursuant to an advertisement mailed to plaintiffs and published in newspapers and other news media by the United States Mint. In the alternative they sought mandamus relief for the delivery of the coins. Plaintiffs also filed a motion for certification of the class.
 
 
 2
 The defendants filed a motion to dismiss plaintiffs' suit, or in the alternative for summary judgment. On April 13, 1987, the court granted judgment for defendants on their motion in its entirety. No action was taken by the court on the class action motion because it was moot after the other action by the court. The plaintiffs filed an appeal (No. 87-8445) in the United States Court of Appeals for the Eleventh Circuit. On motion of defendants, the case was transferred to this court.
 
 
 3
 The facts in the case, as stated in an order of the district court dated April 13, 1987, (with a few omissions and additions), and as shown by the record are as follow.
 
 
 4
 In July 1985, Congress passed the Statue of Liberty-Ellis Island Commemorative Coin Act. Pub.L. No. 99-61, 99 Stat. 113 (July 9, 1985). The purpose of the Act was to provide funds, through the sale of a limited number of specially-minted commemorative coins, "to restore and renovate the Statue of Liberty and the facilities used for immigration at Ellis Island," and to establish an endowment to provide for the upkeep and maintenance of these national monuments. The Act, which by modern standards is a commendable example of brevity, instructed the Secretary of the Treasury: to mint a stated number of coins; to follow certain procedures with respect to the marketing of the coins; to disburse specified surcharges included in the price of each coin to the Statue of Liberty Foundation; and to take all actions necessary to ensure that the project would result in no net cost to the government.
 
 
 5
 Perhaps in this day and age it will surprise no one that such a laudable piece of legislation has spawned a civil action against the government. More accurately, the manner in which the coins were sold to the public, rather than the legislation itself, led to the initiation of this lawsuit by the plaintiffs. In all fairness to the plaintiffs, the court must take judicial notice that the marketing of the coins may not have been a perfectly administered process.
 
 
 6
 The provision of the Act that is directly implicated in this action is Sec. 105(c), which reads: "The Secretary [of the Treasury] shall accept prepaid orders for [commemorative] coins prior to the issuance of the coins. Sales under this subsection shall be at a reasonable discount to reflect the benefit of prepayment." A related provision, Sec. 105(d), authorized bulk sales of commemorative coins at a discount. Pursuant to these provisions, in November and December 1985, the Mint mailed certain advertising materials to persons, including the plaintiffs, whose names were included on a list of previous customers/coin collectors. These materials described the various coins the issuance of which was authorized by the Act,[1] and encouraged potential purchasers to forward early payment for commemorative coins. The materials represented, inter alia, that "[i]f [the Mint] receive[s] your reservation by December 31, 1985, you will enjoy a favorable Pre-Issue Discount saving you up to 16% on your coins." Payment could be made either by check, money order, or credit card. Apparently, the Mint had not previously dealt with credit card sales, and the processing of credit card orders, which in this case turned out to be an almost impossible ordeal, was contracted to the Mellon Bank in Pittsburgh, Pennsylvania.
 
 
 7
 The materials included an order form. Directly above the space provided on this form for the customer's signature was the following:
 
 
 8
 VERY IMPORTANT--PLEASE READ: YES, Please accept my order for the U.S. Liberty Coins I have indicated. I understand that all sales are final and not subject to refund. Verification of my order will be made by the Department of the Treasury, U.S. Mint. My coins may be delivered in multiple shipments. If my order is received by December 31, 1985, I will be entitled to purchase the coins at the Pre-Issue Discount price shown. I have read, understand and agree to the above.[2]
 
 
 9
 Demand for the coins far exceeded the Mint's expectations. While supplies of the half-dollar and one-dollar coins minted pursuant to the Act were more than adequate to meet the demands of all purchasers both during the pre-issue discount period and for many months thereafter, there was an insufficient quantity of five-dollar gold coins, however, with which to fill the orders of many of those who responded to the Mint's promotional materials. According to the Mint's "knowledge and belief," the last order for gold coins that was filled was accepted "some time between December 31, 1985, and January 6, 1986.[3] This exhausted the supply of 500,000 gold coins the issuance of which was authorized by the Act.
 
 
 10
 A great many would-be acquisitors of gold coins were disappointed by the news of the sell-out. These individuals, many of whom were coin dealers, developed a more serious case of disappointment when it became apparent that the gold coins had increased in value by approximately 200% within the first few months of 1986. Notwithstanding the foregoing facts, which understandably would be cause for tears on the part of those turned away, collectors and dealers alike, it is quite possible that no legal action against the Mint would have been contemplated had not certain matters concerning the treatment of credit card orders come to light. In this regard, the ordeal faced by plaintiffs Mary and Anthony Mesaros appears not to have been atypical.
 
 
 11
 Plaintiffs allege that on November 26, 1985, Mary Mesaros forwarded to the Mint an order for certain Statue of Liberty coins. Information concerning Anthony Mesaros' credit card was included on the order form, reflecting that the sum of $1,675 should be charged against Mr. Mesaros' credit account. Subsequently, on December 30, 1985, Anthony Mesaros forwarded orders for an additional eighteen gold coins to the Mint. These orders were placed in the names of members of the Mesaros family, and were paid for with nine separate checks.
 
 
 12
 On February 18, 1986, the Mesaroses were informed by form letter that the Mint "had tried but was unable" to process the Mesaroses' November 26, 1985, credit card order. The letter directed the plaintiffs to contact their financial institution for details relating to the rejection of their order. A new order form was forwarded to the Mesaroses along with the form letter, with which the plaintiffs were informed that they could order "the options currently available." The options then available, of course, did not include five-dollar gold coins. Investigation by Mr. Mesaros revealed that his bank had not been responsible for the rejection of his credit card order. By letter of April 7, 1986, an officer of the Columbus (Georgia) Bank and Trust Company informed Mr. Mesaros that, in fact, on December 27, 1985, that bank had given authorization to the Mellon Bank (responsible for processing credit card orders for the Mint) with respect to the coin order charged to Mr. Mesaros' account. In or about May 1986, the Mesaroses received the eighteen coins that had been paid for by checks dated December 30, 1985.
 
 
 13
 During the early months of 1986, rumors and information began to filter through the ranks of coin collectors and dealers concerning rejections of credit card orders under circumstances similar to those faced by the Mesaroses. It was becoming apparent by March or April that persons who had paid by wires, money orders or checks, dated as late as the end of December, were receiving their coins from the Mint, while many persons who had submitted credit card orders (in November in certain cases) were not receiving their coins. These disappointed credit card customers were sent form letters by the Mint informing them either that the Mint had "tried but was unable" to process their orders (such as that received by the Mesaroses, see supra ), or that their order could not be processed because the gold coins had sold out. According to plaintiffs, the rejection of their credit card order, and the rejection of other collectors' and dealers' credit card orders, is inexplicable on any reasonable basis, in that there existed no inaccuracies in the information provided to the Mint and no shortage of credit on the part of those submitting orders.
 
 
 14
 According to the Mint, over 756,000 orders for Statue of Liberty coins had been received as of May 30, 1986, 186,000 of which were credit card orders. According to plaintiffs, approximately 13,000 credit card orders were rejected. However, the record shows that many of the credit card orders were insufficient or incorrect for one reason or another. For instance, some were illegible or mutilated, others did not include the expiration date of the credit card, some were unsigned, and on others the standard check with the issuers (Visa and Mastercard) showed that the purchase would exceed the customer's credit limit. On still others there was no matching account number shown in the credit card companies' records. In many instances there was a discrepancy between the number of coins or sets ordered and the amounts specified by the customer. Some of the orders did not have the full credit numbers inscribed thereon.
 
 
 15
 The record does not indicate that the Mesaros order involved here had any of the above deficiencies, but, on the other hand, it was not a model of clarity and could have, and may have, caused some confusion in the verification process. For instance, plaintiff Mary Mesaros ordered the coins by sending the order form to the Mint. (p 17 of Amended Complaint, Appendix 30-31). Her name and address were on the form. Consequently, she was the prospective purchaser. However, she did not enclose a check or money order in payment for the coins. Instead, she enclosed a credit card application form signed by another person, namely, Anthony C. Mesaros. His address does not appear on the form. Mary and Anthony were husband and wife, but this is not shown on the form. Undoubtedly, these circumstances increased the complexity of the already complex process of verification of the order and credit card payment. The record shows that the Mint and the Mellon Bank were simply swamped with a deluge of 756,000 orders, of which 186,000 were credit card orders. Cash orders were filled fairly promptly by the Mint, but credit card orders before being filled had to be sent by the Mint to the Mellon Bank in Pittsburgh for verification, investigation, and determination of validity. This was at best a slow process. Credit card orders, when approved by the Mellon Bank were certified as valid and returned to the Mint to be filled. Before all of the 186,000 credit card orders could be verified by the Mellon Bank and thereafter filled by the Mint, all of the gold coins had been sold by the Mint in filling cash orders, and no more coins were available. As a result, 13,000 unverified and uncertified credit card orders could not be filled, and were rejected by the Mint. The Mesaros order was in this rejected group. On February 18, 1986, the Mint advised the Mesaroses by a form letter that the Mint "had tried but was unable" to process the Mesaros credit card order, and returned the order form. Anthony Mesaros was so enraged by this turn of events that he wrote the word "bastards" across the front of the returned original order.
 
 
 16
 On May 23, 1986, plaintiffs filed suit in the district court, seeking either damages on a breach of contract theory or, in the alternative, mandamus relief in the form of a court order forcing defendants to accept plaintiffs' credit card order. Such mandamus relief would ultimately require, according to plaintiffs, the government to deliver the plaintiffs the gold coins that they ordered in November 1985.
 
 Breach of Contract
 
 17
 The plaintiffs claim that the Mint breached an express contract with them and that they are entitled to recover money damages from defendants for this breach. They allege that the district court has jurisdiction over the claim under 28 U.S.C. Sec. 1346 known as the Tucker Act.[4] We agree because the plaintiffs have alleged the existence of a contract with the government, the breach of that contract by the government, and a claim of damages for the breach not in excess of $10,000.
 
 
 18
 The plaintiffs contend that the materials sent to them by the Mint, including the order form, constituted an offer that upon acceptance by the plaintiffs created a binding contract between them and the government whereby the government was bound and obligated to deliver the coins ordered by them. The great weight of authority is against the plaintiffs. It is well established that materials such as those mailed to prospective customers by the Mint are no more than advertisements or invitations to deal. They are mere notices and solicitations for offers which create no power of acceptance in the recipient. Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 539 (9th Cir.1983), cert. denied, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984). See also Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 571-72 (3d Cir.1986) (distribution of wholesale order forms was not offer to grant automobile franchise); Chicago Joint Board, Amalgamated Clothing Workers of America, AFL-CIO v. Chicago Tribune Co., 307 F.Supp. 422, 424 (N.D.Ill.1969) (general advertising aimed at public is not offer); Bissell Carpet Sweeper Co. v. Masters Mail Order Co., 140 F.Supp. 165, 172 (D.Md.1956) (mail order materials construed as solicitation of offers/orders); 17A C.J.S. Contracts Sec. 46 ("[G]enerally a ... circular couched in general language and proper to be sent to all persons interested in a particular trade or business, or a prospectus of general and descriptive nature, will be construed as an invitation to make an offer."); Restatement (Second) Contracts, Sec. 26.
 
 
 19
 It is stated in Williston, A Treatise on the Law of Contracts, Sec. 27 (3rd ed. 1957):
 
 
 20
 Thus, if goods are advertised for sale at a certain price, it is not an offer, and no contract is formed by the statement of an intending purchaser that he will take a specified quantity of the goods at that price. The construction is rather favored that such an advertisement is a mere invitation to enter into a bargain rather than an offer. So a published price list is not an offer to sell the goods listed at the published prices.
 
 
 21
 See also Corbin, Contracts, Secs. 25, 28 (1963 ed.); Lane v. Hopfeld, 160 Conn. 53, 273 A.2d 721 (1970); Montgomery Ward & Co. v. Johnson, 209 Mass. 89, 95 N.E. 290 (1911); Lovett v. Frederick Loeser & Co., 124 Misc. 81, 207 N.Y.S. 753 (1924); Osage Homestead, Inc. v. Sutphin, 657 S.W.2d 346 (Mo.App.1983).
 
 
 22
 A basic rule of contracts holds that whether an offer has been made depends on the objective reasonableness of the alleged offeree's belief that the advertisement or solicitation was intended as an offer. Generally, it is considered unreasonable for a person to believe that advertisements and solicitations are offers that bind the advertiser. Otherwise, the advertiser could be bound by an excessive number of contracts requiring delivery of goods far in excess of amounts available. That is particularly true in the instant case where the gold coins were limited to 500,000 by the Act of Congress. We conclude that a thorough reading, construction, and interpretation of the materials sent to the plaintiffs by the Mint makes clear that the contention of the plaintiffs that they reasonably believed the materials were intended as an offer is unreasonable as a matter of law. This is especially true in view of the words "YES, Please accept my order ..." that were printed on the credit card form, which showed that the credit card order was an offer from the plaintiffs to the Mint to buy the coins, which offer might or might not be accepted by the Mint. Accordingly, the Mint materials were intended solely as solicitations of offers from customers that were subject to acceptance by the Mint before the Mint would be bound by a contract. This is in accord with the following statement from I Corbin, Contracts, 375-76 Sec. 88 (1963):
 
 
 23
 Where one party solicits and receives an order or other expression of agreement from another, clearly specifying that there is to be no contract until ratification or assent by some officer or representative of the solicitor, the solicitation is not itself an offer; it is a request for an offer.
 
 
 24
 The plaintiffs rely on Lefkowitz v. Great Minneapolis Surplus Store, 251 Minn. 188, 86 N.W.2d 689 (1957). In that case a store advertised one fur stole worth $139.50 for sale for $1.00 on a first-come, first-served basis when the store opened at 9:00 a.m. The plaintiff arrived first, but the store refused to sell the stole to him. The plaintiff sued for breach of contract. The court held under these unusual facts that the advertisement constituted an offer. That case is clearly distinguishable from our case on the facts. Here the Mint had 35,500,000 coins for sale to the general public for which it received over 756,000 orders. The Mint advertisement did not state that the coins would be sold on a first-come, first-served basis, as in Lefkowitz, or on any other particular basis. Since the coins could be paid for with checks, money orders or credit cards, it would have been impossible for the Mint to have processed the sales on a first-come, first-served basis. The situation in Lefkowitz was so different that it is of no help to the plaintiffs.
 
 
 25
 We hold that the Mint advertisement materials were not an offer of sale of the coins that could be accepted by the plaintiffs to create a contract, and that no contract was made between the plaintiffs and the government with reference to the coins.
 
 
 26
 The plaintiffs failed to allege any genuine issue of material fact, and, therefore, the court was correct as a matter of law in granting summary judgment for the defendants.
 
 Mandamus
 
 27
 In Count II of plaintiffs' amended complaint, they seek alternatively a writ of mandamus pursuant to 28 U.S.C. Sec. 1361 on the ground that the Coin Act created a statutory duty upon the government to accept their order for the coins. The plaintiffs argue that even if the promotional materials sent to them by the Mint did not constitute an offer of sale, nevertheless, the Mint had a statutory duty to accept orders submitted to it by plaintiffs and other would-be purchasers on a first-come, first-served basis. It is clear that the district court would not have jurisdiction of the mandamus claim apart from the breach of contract claim unless the Mint had a statutory duty that it owed to the plaintiffs. See Davis Assocs., Inc. v. Secretary of Housing and Urban Development, 498 F.2d 385, 388 (1st Cir.1974); Kirkland Masonry, Inc. v. Comm'r of Internal Revenue, 614 F.2d 532 (5th Cir.1980) (no mandamus jurisdiction absent a statutory duty owed specifically to plaintiff). The plaintiffs are asking the court for an order requiring the government to enter into a contract with them and ordering the government to deliver to them the gold coins they had ordered.
 
 
 28
 The court is without authority to order the Mint to deliver the coins to the plaintiffs for several reasons. In the first place, all of the coins have been sold and no more are available. In the next place, such an order would require the Mint to produce more gold coins, which would violate both the Constitution and the Coin Act. Article 1, Section 8, Clause 5 of the United States Constitution vests the power to mint coins exclusively in the Congress. The Mint has no power to mint coins unless it has been authorized to do so by Congress. Furthermore, an order by the court requiring the government to mint more coins to fill plaintiffs' order would force the Mint to act beyond the authority granted to it by Sec. 102(a)(1) of the Coin Act, which authorized the production of no more than 500,000 gold coins. It is well settled that an agency's power is no greater than that delegated to it by Congress. Lyng v. Payne, 476 U.S. 926, 934, 106 S.Ct. 2333, 2339, 90 L.Ed.2d 921 (1986).
 
 
 29
 The plaintiffs argue that even if the coins cannot be delivered to them, the government should be ordered by the court to enter into a contract with them for the delivery of the coins, and if the government breached the contract they would be entitled to damages. Plaintiffs say in support of this argument that the Mint had a statutory duty to enter into contracts with customers on a first-come, first-served basis, and since the government breached this duty, mandamus is the proper remedy. We do not agree. There is nothing in the Act that imposed a duty on the Mint to enter into contracts on a first-come, first-served basis, or in any other particular sequence or manner. The plaintiffs rely on language in the statute that states that "[t]he Secretary shall accept prepaid orders for the coins prior to the issuance of the coins...." We find nothing in this language nor in any other language in the statute that creates a duty on the Secretary or the Mint to handle coin orders in any particular way. The Act gave the Secretary great discretion and broad authority in administering the statute. Design Pak, Inc. v. Secretary of the Treasury, 801 F.2d 525, 527 (1st Cir.1985). We conclude that he did not abuse his discretion in performing his duties under the Act.
 
 
 30
 We hold that there was no statutory duty on the Mint to enter into a contract with plaintiffs and others on a first-come, first-served basis or in any other particular sequence or order. There being no such duty, the district court was without jurisdiction of plaintiffs' mandamus claim and properly granted defendants' motion to dismiss.
 
 
 31
 In view of our decision, it is not necessary to consider plaintiffs' motion to certify their petition as a class action.
 
 
 32
 The decision of the district court in his well-written order is affirmed.
 
 
 33
 AFFIRMED.
 
 
 
 [1]
 At this juncture it is appropriate to note that the Act authorized the issuance of three different commemorative coins, and that different quantities of each type of coin were to be minted. The minting of no more than twenty-five million half-dollar clad coins was authorized; no more than ten million one-dollar silver coins could be issued; and only 500,000 gold five-dollar pieces were to be produced
 
 
 [2]
 On the opposite side of the form the following language appeared:
 As a special courtesy to collectors, you are receiving advance notice of the minting and issuing of three new U.S. coins authorized by Congress to commemorate the centennial of the Statue of Liberty. If you place your reservation prior to December 31, 1985, you will be eligible for a Congressionally authorized Pre-Issue Discount on all coins and sets of coins. Use this form to reserve your Liberty Coins direct from the U.S. Mint. All coins will be accompanied by a Liberty Coin presentation case and certificate.
 * * *
 Please allow 6 to 8 weeks for delivery after issue date of January 1, 1986. The U.S. Mint reserves the right to limit quantities shipped, subject to availability. Mint may discontinue accepting orders should bullion prices increase significantly. Credit card orders will be billed upon receipt by the U.S. Mint.
 
 
 [3]
 Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment, Exh.D., Defendants' Answer to Plaintiffs' Interrogatory No. 1. The court notes, however, that the Mint apparently accepted an order for 640 gold coins on January 8, 1986, and that this order was filled. Id., Defendants' Answer to Plaintiffs' Interrogatory No. 7
 
 
 [4]
 The Tucker Act grants to the federal district courts original jurisdiction, concurrent with that of the Claims Court, over, inter alia, contractual suits against the United States where the amount in controversy is not in excess of $10,000. 28 U.S.C. Sec. 1346(a)(2)