**John D.R. LEONARD, Plaintiff,**

v.

**PEPSICO, INC., Defendant.**

**Nos. 96 Civ. 5320(KMW),**
**96 Civ. 9069(KMW).**

United States District Court,
S.D. New York.

Aug. 5, 1999.

OPINION & ORDER

KIMBA M. WOOD, District Judge.

Plaintiff brought this action seeking, among other things, specific performance

of an alleged offer of a Harrier Jet, featured in a television advertisement for defendant's "Pepsi Stuff" promotion. Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, defendant's motion is granted.

### I. Background

This case arises out of a promotional campaign conducted by defendant, the producer and distributor of the soft drinks Pepsi and Diet Pepsi. (*See* PepsiCo Inc.'s Rule 56.1 Statement ("Def. Stat.") ¶ 2.)[1] The promotion, entitled "Pepsi Stuff," encouraged consumers to collect "Pepsi Points" from specially marked packages of Pepsi or Diet Pepsi and redeem these points for merchandise featuring the Pepsi logo. (*See id.* ¶¶ 4, 8.) Before introducing the promotion nationally, defendant conducted a test of the promotion in the Pacific Northwest from October 1995 to March 1996. (*See id.* ¶¶ 5–6.) A Pepsi Stuff catalog was distributed to consumers in the test market, including Washington State. (*See id.* ¶ 7.) Plaintiff is a resident of Seattle, Washington. (*See id.* ¶ 3.) While living in Seattle, plaintiff saw the Pepsi Stuff commercial (*see id.* ¶ 22) that he contends constituted an offer of a Harrier Jet.

### A. The Alleged Offer

Because whether the television commercial constituted an offer is the central question in this case, the Court will describe the commercial in detail. The commercial opens upon an idyllic, suburban morning, where the chirping of birds in sun-dappled trees welcomes a paperboy on his morning route. As the newspaper hits the stoop of a conventional two-story house, the tattoo of a military drum introduces the subtitle, "MONDAY 7:58 AM." The stirring strains of a martial air mark the appearance of a well-coiffed teenager preparing to leave for school, dressed in a shirt emblazoned with the Pepsi logo, a red-white-and-blue ball. While the teenager confidently preens, the military drumroll again sounds as the subtitle "T–SHIRT 75 PEPSI POINTS" scrolls across the screen. Bursting from his room, the teenager strides down the hallway wearing a leather jacket. The drumroll sounds again, as the subtitle "LEATHER JACKET 1450 PEPSI POINTS" appears. The teenager opens the door of his house and, unfazed by the glare of the early morning sunshine, puts on a pair of sunglasses. The drumroll then accompanies the subtitle "SHADES 175 PEPSI POINTS." A voiceover then intones, "Introducing the new Pepsi Stuff catalog," as the camera focuses on the cover of the catalog. (*See* Defendant's Local Rule 56.1 Stat., Exh. A (the "Catalog").)[2]

The scene then shifts to three young boys sitting in front of a high school building. The boy in the middle is intent on his Pepsi Stuff Catalog, while the boys on either side are each drinking Pepsi. The three boys gaze in awe at an object rushing overhead, as the military march builds to a crescendo. The Harrier Jet is not yet visible, but the observer senses the presence of a mighty plane as the extreme winds generated by its flight create a paper maelstrom in a classroom devoted to an otherwise dull physics lesson. Finally,

---

1. The Court's recitation of the facts of this case is drawn from the statements of uncontested facts submitted by the parties pursuant to Local Civil Rule 56.1. The majority of citations are to defendant's statement of facts because plaintiff does not contest many of defendant's factual assertions. (*See* Plaintiff Leonard's Response to PepsiCo's Rule 56.1 Statement ("Pl.Stat.").) Plaintiff's disagreement with certain of defendant's statements is noted in the text.

 In an Order dated November 24, 1997, in a related case (96 Civ. 5320), the Court set forth an initial account of the facts of this case. Because the parties have had additional discovery since that Order and have crafted Local Civil Rule 56.1 Statements and Counterstatements, the recitation of facts herein should be considered definitive.

2. At this point, the following message appears at the bottom of the screen: "Offer not available in all areas. See details on specially marked packages."

the Harrier Jet swings into view and lands by the side of the school building, next to a bicycle rack. Several students run for cover, and the velocity of the wind strips one hapless faculty member down to his underwear. While the faculty member is being deprived of his dignity, the voiceover announces: "Now the more Pepsi you drink, the more great stuff you're gonna get."

The teenager opens the cockpit of the fighter and can be seen, helmetless, holding a Pepsi. "[L]ooking very pleased with himself," (Pl. Mem. at 3,) the teenager exclaims, "Sure beats the bus," and chortles. The military drumroll sounds a final time, as the following words appear: "HARRIER FIGHTER 7,000,000 PEPSI POINTS." A few seconds later, the following appears in more stylized script: "Drink Pepsi—Get Stuff." With that message, the music and the commercial end with a triumphant flourish.

Inspired by this commercial, plaintiff set out to obtain a Harrier Jet. Plaintiff explains that he is "typical of the 'Pepsi Generation' ... he is young, has an adventurous spirit, and the notion of obtaining a Harrier Jet appealed to him enormously." (Pl. Mem. at 3.) Plaintiff consulted the Pepsi Stuff Catalog. The Catalog features youths dressed in Pepsi Stuff regalia or enjoying Pepsi Stuff accessories, such as "Blue Shades" ("As if you need another reason to look forward to sunny days."), "Pepsi Tees" ("Live in 'em. Laugh in 'em. Get in 'em."), "Bag of Balls" ("Three balls. One bag. No rules."), and "Pepsi Phone Card" ("Call your mom!"). The Catalog specifies the number of Pepsi Points required to obtain promotional merchandise. (See Catalog, at rear foldout pages.) The Catalog includes an Order Form which lists, on one side, fifty-three items of Pepsi Stuff merchandise redeemable for Pepsi Points (see id. (the "Order Form")). Conspicuously absent from the Order Form is any entry or description of a Harrier Jet. (See id.) The amount of Pepsi Points required to obtain the listed merchandise ranges from 15 (for a "Jacket Tattoo" ("Sew 'em on your jacket, not your arm.")) to 3300 (for a "Fila Mountain Bike" ("Rugged. All-terrain. Exclusively for Pepsi.")). It should be noted that plaintiff objects to the implication that because an item was not shown in the Catalog, it was unavailable. (See Pl. Stat. ¶¶ 23–26, 29.)

The rear foldout pages of the Catalog contain directions for redeeming Pepsi Points for merchandise. (See Catalog, at rear foldout pages.) These directions note that merchandise may be ordered "only" with the original Order Form. (See id.) The Catalog notes that in the event that a consumer lacks enough Pepsi Points to obtain a desired item, additional Pepsi Points may be purchased for ten cents each; however, at least fifteen original Pepsi Points must accompany each order. (See id.)

Although plaintiff initially set out to collect 7,000,000 Pepsi Points by consuming Pepsi products, it soon became clear to him that he "would not be able to buy (let alone drink) enough Pepsi to collect the necessary Pepsi Points fast enough." (Affidavit of John D.R. Leonard, Mar. 30, 1999 ("Leonard Aff."), ¶ 5.) Reevaluating his strategy, plaintiff "focused for the first time on the packaging materials in the Pepsi Stuff promotion," (id.,) and realized that buying Pepsi Points would be a more promising option. (See id.) Through acquaintances, plaintiff ultimately raised about $700,000. (See id. ¶ 6.)

B. *Plaintiff's Efforts to Redeem the Alleged Offer*

On or about March 27, 1996, plaintiff submitted an Order Form, fifteen original Pepsi Points, and a check for $700,008.50. (See Def. Stat. ¶ 36.) Plaintiff appears to have been represented by counsel at the time he mailed his check; the check is drawn on an account of plaintiff's first set of attorneys. (See Defendant's Notice of Motion, Exh. B (first).) At the bottom of the Order Form, plaintiff wrote in "1 Harrier Jet" in the "Item" column and "7,000,000" in the "Total Points" column. (See id.) In a letter accompanying his submis-

sion, plaintiff stated that the check was to purchase additional Pepsi Points "expressly for obtaining a new Harrier jet as advertised in your Pepsi Stuff commercial." (*See* Declaration of David Wynn, Mar. 18, 1999 ("Wynn Dec."), Exh. A.)

On or about May 7, 1996, defendant's fulfillment house rejected plaintiff's submission and returned the check, explaining that:

> The item that you have requested is not part of the Pepsi Stuff collection. It is not included in the catalogue or on the order form, and only catalogue merchandise can be redeemed under this program.
>
> The Harrier jet in the Pepsi commercial is fanciful and is simply included to create a humorous and entertaining ad. We apologize for any misunderstanding or confusion that you may have experienced and are enclosing some free product coupons for your use.

(Wynn Aff. Exh. B (second).) Plaintiff's previous counsel responded on or about May 14, 1996, as follows:

> Your letter of May 7, 1996 is totally unacceptable. We have reviewed the video tape of the Pepsi Stuff commercial . . . and it clearly offers the new Harrier jet for 7,000,000 Pepsi Points. Our client followed your rules explicitly. . . .
>
> This is a formal demand that you honor your commitment and make immediate arrangements to transfer the new Harrier jet to our client. If we do not receive transfer instructions within ten (10) business days of the date of this letter you will leave us no choice but to file an appropriate action against Pepsi. . . .

(Wynn Aff., Exh. C.) This letter was apparently sent onward to the advertising company responsible for the actual commercial, BBDO New York ("BBDO"). In a letter dated May 30, 1996, BBDO Vice President Raymond E. McGovern, Jr., explained to plaintiff that:

> I find it hard to believe that you are of the opinion that the Pepsi Stuff commercial ("Commercial") really offers a new Harrier Jet. The use of the Jet was clearly a joke that was meant to make the Commercial more humorous and entertaining. In my opinion, no reasonable person would agree with your analysis of the Commercial.

(Wynn Aff. Exh. A.) On or about June 17, 1996, plaintiff mailed a similar demand letter to defendant. (*See* Wynn Aff., Exh. D.)

Litigation of this case initially involved two lawsuits, the first a declaratory judgment action brought by PepsiCo in this district (the "declaratory judgment action"), and the second an action brought by Leonard in Florida state court (the "Florida action").[3] PepsiCo brought suit in this Court on July 18, 1996, seeking a declaratory judgment stating that it had no obligation to furnish plaintiff with a Harrier Jet. That case was filed under docket number 96 Civ. 5320. In response to PepsiCo's suit in New York, Leonard brought suit in Florida state court on August 6, 1996, although this case had nothing to do with Florida.[4] That suit was removed to the Southern District of Florida in September 1996. In an Order dated November 6, 1996, United States District Judge James Lawrence King found that, "Obviously this case has been filed in a form that has no meaningful relationship to the controversy and warrants a transfer pursuant to 28 U.S.C. § 1404(a)." *Leonard v. PepsiCo,*

---

3. Because Leonard and PepsiCo were each plaintiff in one action and defendant in the other, the Court will refer to the parties as "Leonard" and "PepsiCo," rather than plaintiff and defendant, for its discussion of the procedural history of this litigation.

4. The Florida suit alleged that the commercial had been shown in Florida. Not only was

this assertion irrelevant, in that plaintiff had not actually seen the commercial in Florida, but it later proved to be false. *See Leonard v. PepsiCo,* 96–2555 Civ.-King, at 1 (S.D.Fla. Nov. 6, 1996) ("The only connection this case has to this forum is that Plaintiff's lawyer is in the Southern District of Florida.").

96–2555 Civ.-King, at 1 (S.D.Fla. Nov. 6, 1996). The Florida suit was transferred to this Court on December 2, 1996, and assigned the docket number 96 Civ. 9069.

Once the Florida action had been transferred, Leonard moved to dismiss the declaratory judgment action for lack of personal jurisdiction. In an Order dated November 24, 1997, the Court granted the motion to dismiss for lack of personal jurisdiction in case 96 Civ. 5320, from which PepsiCo appealed. Leonard also moved to voluntarily dismiss the Florida action. While the Court indicated that the motion was proper, it noted that PepsiCo was entitled to some compensation for the costs of litigating this case in Florida, a forum that had no meaningful relationship to the case. (*See* Transcript of Proceedings Before Hon. Kimba M. Wood, Dec. 9, 1997, at 3.) In an Order dated December 15, 1997, the Court granted Leonard's motion to voluntarily dismiss this case without prejudice, but did so on condition that Leonard pay certain attorneys' fees.

In an Order dated October 1, 1998, the Court ordered Leonard to pay $88,162 in attorneys' fees within thirty days. Leonard failed to do so, yet sought nonetheless to appeal from his voluntary dismissal and the imposition of fees. In an Order dated January 5, 1999, the Court noted that Leonard's strategy was " 'clearly an end-run around the final judgment rule.' " (Order at 2 (quoting *Palmieri v. Defaria,* 88 F.3d 136 (2d Cir.1996)).) Accordingly, the Court ordered Leonard either to pay the amount due or withdraw his voluntary dismissal, as well as his appeals therefrom, and continue litigation before this Court. (*See* Order at 3.) Rather than pay the attorneys' fees, Leonard elected to proceed with litigation, and shortly thereafter retained present counsel.

On February 22, 1999, the Second Circuit endorsed the parties' stipulations to the dismissal of any appeals taken thus far in this case. Those stipulations noted that Leonard had consented to the jurisdiction of this Court and that PepsiCo agreed not to seek enforcement of the attorneys' fees award. With these issues having been waived, PepsiCo moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The present motion thus follows three years of jurisdictional and procedural wrangling.

## II. Discussion

### A. The Legal Framework

#### 1. Standard for Summary Judgment

On a motion for summary judgment, a court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir. 1987) (citations and internal quotation marks omitted). To prevail on a motion for summary judgment, the moving party therefore must show that there are no such genuine issues of material fact to be tried, and that he or she is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Citizens Bank v. Hunt,* 927 F.2d 707, 710 (2d Cir.1991). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," which includes identifying the materials in the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

Once a motion for summary judgment is made and supported, the non-moving party must set forth specific facts that show that there is a genuine issue to be tried. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although a court considering a motion for summary judgment must view all evidence in the light most favorable to the non-moving party, and must draw all reasonable inferences in that party's favor, *see Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir. 1993), the nonmoving party "must do more

122

than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If, based on the submissions to the court, no rational fact-finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate. *See Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

■ The question of whether or not a contract was formed is appropriate for resolution on summary judgment. As the Second Circuit has recently noted, "Summary judgment is proper when the 'words and actions that allegedly formed a contract [are] so clear themselves that reasonable people could not differ over their meaning.'" *Krumme v. Westpoint Stevens, Inc.*, 143 F.3d 71, 83 (2d Cir.1998) (quoting *Bourque v. FDIC*, 42 F.3d 704, 708 (1st Cir.1994)) (further citations omitted); *see also Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) (summary judgment is appropriate in contract case where interpretation urged by non-moving party is not "fairly reasonable"). Summary judgment is appropriate in such cases because there is "sometimes no genuine issue as to whether the parties' conduct implied a 'contractual understanding.'.... In such cases, 'the judge must decide the issue himself, just as he decides any factual issue in respect to which reasonable people cannot differ.'" *Bourque*, 42 F.3d at 708 (quoting *Boston Five Cents Sav. Bank v. Secretary of Dep't of Housing & Urban Dev.*, 768 F.2d 5, 8 (1st Cir.1985)).

### 2. *Choice of Law*

■ The parties disagree concerning whether the Court should apply the law of the state of New York or of some other state in evaluating whether defendant's promotional campaign constituted an offer. Because this action was transferred from Florida, the choice of law rules of Florida, the transferor state, apply. *See Ferens v. John Deere Co.*, 494 U.S. 516, 523–33, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). Under

Florida law, the choice of law in a contract case is determined by the place "where the last act necessary to complete the contract is done." *Jemco, Inc. v. United Parcel Serv., Inc.*, 400 So.2d 499, 500–01 (Fla.Dist. Ct.App.1981); *see also Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1119 (11th Cir.1990).

The parties disagree as to whether the contract could have been completed by plaintiff's filling out the Order Form to request a Harrier Jet, or by defendant's acceptance of the Order Form. If the commercial constituted an offer, then the last act necessary to complete the contract would be plaintiff's acceptance, in the state of Washington. If the commercial constituted a solicitation to receive offers, then the last act necessary to complete the contract would be defendant's acceptance of plaintiff's Order Form, in the state of New York. The choice of law question cannot, therefore, be resolved until after the Court determines whether the commercial was an offer or not. The Court agrees with both parties that resolution of this issue requires consideration of principles of contract law that are not limited to the law of any one state. Most of the cases cited by the parties are not from New York courts. As plaintiff suggests, the questions presented by this case implicate questions of contract law "deeply ingrained in the common law of England and the States of the Union." (Pl. Mem. at 8.)

### B. *Defendant's Advertisement Was Not An Offer*

#### 1. *Advertisements as Offers*

■ The general rule is that an advertisement does not constitute an offer. The *Restatement (Second) of Contracts* explains that:

Advertisements of goods by display, sign, handbill, newspaper, radio or television are not ordinarily intended or understood as offers to sell. The same is true of catalogues, price lists and circulars, even though the terms of suggested bargains may be stated in some detail.

It is of course possible to make an offer by an advertisement directed to the general public (see § 29), but there must ordinarily be some language of commitment or some invitation to take action without further communication.

*Restatement (Second) of Contracts* § 26 cmt. b (1979). Similarly, a leading treatise notes that:

It is quite possible to make a definite and operative offer to buy or sell goods by advertisement, in a newspaper, by a handbill, a catalog or circular or on a placard in a store window. *It is not customary to do this, however; and the presumption is the other way.* ... Such advertisements are understood to be mere requests to consider and examine and negotiate; and no one can reasonably regard them as otherwise unless the circumstances are exceptional and the words used are very plain and clear.

1 Arthur Linton Corbin & Joseph M. Perillo, *Corbin on Contracts* § 2.4, at 116–17 (rev. ed.1993) (emphasis added); *see also* 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.10, at 239 (2d ed.1998); 1 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 4:7, at 286–87 (4th ed.1990). New York courts adhere to this general principle. *See Lovett v. Frederick Loeser & Co.*, 124 Misc. 81, 207 N.Y.S. 753, 755 (N.Y.Mun.Ct.1924) (noting that an "advertisement is nothing but an invitation to enter into negotiations, and is not an offer which may be turned into a contract by a person who signifies his intention to purchase some of the articles mentioned in the advertisement"); *see also Geismar v. Abraham & Strauss*, 109 Misc.2d 495, 439 N.Y.S.2d 1005, 1006 (N.Y.Dist.Ct.1981) (reiterating *Lovett* rule); *People v. Gimbel Bros.*, 202 Misc. 229, 115 N.Y.S.2d 857, 858 (N.Y.Sp.Sess. 1952) (because an "[a]dvertisement does not constitute an offer of sale but is solely an invitation to customers to make an offer

to purchase," defendant not guilty of selling property on Sunday).

An advertisement is not transformed into an enforceable offer merely by a potential offeree's expression of willingness to accept the offer through, among other means, completion of an order form. In *Mesaros v. United States*, 845 F.2d 1576 (Fed.Cir.1988), for example, the plaintiffs sued the United States Mint for failure to deliver a number of Statue of Liberty commemorative coins that they had ordered. When demand for the coins proved unexpectedly robust, a number of individuals who had sent in their orders in a timely fashion were left empty-handed. *See id.* at 1578–80. The court began by noting the "well-established" rule that advertisements and order forms are "mere notices and solicitations for offers which create no power of acceptance in the recipient." *Id.* at 1580; *see also Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 538–39 (9th Cir.1983) ("The weight of authority is that purchase orders such as those at issue here are not enforceable contracts until they are accepted by the seller.");[5] *Restatement (Second) of Contracts* § 26 ("A manifestation of willingness to enter a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."). The spurned coin collectors could not maintain a breach of contract action because no contract would be formed until the advertiser accepted the order form and processed payment. *See id.* at 1581; *see also Alligood v. Procter & Gamble*, 72 Ohio App.3d 309, 594 N.E.2d 668 (1991) (finding that no offer was made in promotional campaign for baby diapers, in which consumers were to redeem teddy bear proof-of-purchase symbols for catalog merchandise); *Chang v. First Colonial Savings Bank*, 242 Va. 388,

5. *Foremost Pro* was overruled on other grounds by *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1041 (9th Cir.1987), *aff'd*, 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990). *See Chroma Lighting v. GTE Products Corp.*,

111 F.3d 653, 657 (9th Cir.1997), *cert. denied sub nom.*, *Osram Sylvania Products, Inc. v. Von Der Ahe*, 522 U.S. 943, 118 S.Ct. 357, 139 L.Ed.2d 278 (1997).

410 S.E.2d 928 (1991) (newspaper advertisement for bank settled the terms of the offer once bank accepted plaintiffs' deposit, notwithstanding bank's subsequent effort to amend the terms of the offer). Under these principles, plaintiff's letter of March 27, 1996, with the Order Form and the appropriate number of Pepsi Points, constituted the offer. There would be no enforceable contract until defendant accepted the Order Form and cashed the check.

The exception to the rule that advertisements do not create any power of acceptance in potential offerees is where the advertisement is "clear, definite, and explicit, and leaves nothing open for negotiation," in that circumstance, "it constitutes an offer, acceptance of which will complete the contract." *Lefkowitz v. Great Minneapolis Surplus Store*, 251 Minn. 188, 86 N.W.2d 689, 691 (1957). In *Lefkowitz*, defendant had published a newspaper announcement stating: "Saturday 9 AM Sharp, 3 Brand New Fur Coats, Worth to $100.00, First Come First Served $1 Each." *Id.* at 690. Mr. Morris Lefkowitz arrived at the store, dollar in hand, but was informed that under defendant's "house rules," the offer was open to ladies, but not gentlemen. *See id.* The court ruled that because plaintiff had fulfilled all of the terms of the advertisement and the advertisement was specific and left nothing open for negotiation, a contract had been formed. *See id.; see also Johnson v. Capital City Ford Co.*, 85 So.2d 75, 79 (La.Ct. App.1955) (finding that newspaper advertisement was sufficiently certain and definite to constitute an offer).

The present case is distinguishable from *Lefkowitz.* First, the commercial cannot be regarded in itself as sufficiently definite, because it specifically reserved the details of the offer to a separate writing, the Catalog.[6] The commercial itself made no mention of the steps a potential offeree would be required to take to accept the alleged offer of a Harrier Jet. The advertisement in *Lefkowitz*, in contrast, "identified the person who could accept." Corbin, *supra*, § 2.4, at 119. *See generally United States v. Braunstein*, 75 F.Supp. 137, 139 (S.D.N.Y.1947) ("Greater precision of expression may be required, and less help from the court given, when the parties are merely at the threshold of a contract."); Farnsworth, *supra*, at 239 ("The fact that a proposal is very detailed suggests that it is an offer, while omission of many terms suggests that it is not.").[7] Second, even if the Catalog had included a Harrier Jet among the items that could be obtained by redemption of Pepsi Points, the advertisement of a Harrier Jet by both television commercial and catalog would still not constitute an offer. As the *Mesaros* court explained, the absence of any words of limitation such as "first come, first served," renders the alleged offer sufficiently indefinite that no contract could be formed. *See Mesaros*, 845 F.2d at 1581. "A customer would not usually have reason to believe that the shopkeeper intended exposure to the risk of a multitude of acceptances resulting in a number of contracts exceeding the shopkeeper's inventory." Farnsworth, *supra*, at 242. There was no such danger in *Lefkowitz*, owing to the limitation "first come, first served."

The Court finds, in sum, that the Harrier Jet commercial was merely an advertisement. The Court now turns to the line of cases upon which plaintiff rests much of his argument.

---

**6.** It also communicated additional words of reservation: "Offer not available in all areas. See details on specially marked packages."

**7.** The reservation of the details of the offer in this case distinguishes it from *Payne v. Lautz Bros. & Co.*, 166 N.Y.S. 844 (N.Y.City Ct.1916). In *Payne*, a stamp and coupon broker purchased massive quantities of coupons produced by defendant, a soap company, and tried to redeem them for 4,000 round-trip tickets to a local beach. The court ruled for plaintiff, noting that the advertisements were "absolutely unrestricted. It contained no reference whatever to any of its previous advertising of any form." *Id.* at 848. In the present case, by contrast, the commercial explicitly reserved the details of the offer to the Catalog.

## 2. *Rewards as Offers*

 In opposing the present motion, plaintiff largely relies on a different species of unilateral offer, involving public offers of a reward for performance of a specified act. Because these cases generally involve public declarations regarding the efficacy or trustworthiness of specific products, one court has aptly characterized these authorities as "prove me wrong" cases. *See Rosenthal v. Al Packer Ford*, 36 Md.App. 349, 374 A.2d 377, 380 (1977). The most venerable of these precedents is the case of *Carlill v. Carbolic Smoke Ball Co.*, 1 Q.B. 256 (Court of Appeal, 1892), a quote from which heads plaintiff's memorandum of law: "[I]f a person chooses to make extravagant promises ... he probably does so because it pays him to make them, and, if he has made them, the extravagance of the promises is no reason in law why he should not be bound by them." *Carbolic Smoke Ball*, 1 Q.B. at 268 (Bowen, L.J.).

Long a staple of law school curricula, *Carbolic Smoke Ball* owes its fame not merely to "the comic and slightly mysterious object involved," A.W. Brian Simpson. *Quackery and Contract Law: Carlill v. Carbolic Smoke Ball Company (1893)*, in *Leading Cases in the Common Law* 259, 281 (1995), but also to its role in developing the law of unilateral offers. The case arose during the London influenza epidemic of the 1890s. Among other advertisements of the time, for Clarke's World Famous Blood Mixture, Towle's Pennyroyal and Steel Pills for Females, Sequah's Prairie Flower, and Epp's Glycerine Jube–Jubes, *see* Simpson, *supra*, at 267, appeared solicitations for the Carbolic Smoke Ball. The specific advertisement that Mrs.

Carlill saw, and relied upon, read as follows:

> 100 £ reward will be paid by the Carbolic Smoke Ball Company to any person who contracts the increasing epidemic influenza, colds, or any diseases caused by taking cold, after having used the ball three times daily for two weeks according to the printed directions supplied with each ball. 1000 £ is deposited with the Alliance Bank, Regent Street, shewing our sincerity in the matter.
>
> During the last epidemic of influenza many thousand carbolic smoke balls were sold as preventives against this disease, and in no ascertained case was the disease contracted by those using the carbolic smoke ball.

*Carbolic Smoke Ball*, 1 Q.B. at 256–57. "On the faith of this advertisement," *id.* at 257, Mrs. Carlill purchased the smoke ball and used it as directed, but contracted influenza nevertheless.[8] The lower court held that she was entitled to recover the promised reward.

Affirming the lower court's decision, Lord Justice Lindley began by noting that the advertisement was an express promise to pay £ 100 in the event that a consumer of the Carbolic Smoke Ball was stricken with influenza. *See id.* at 261. The advertisement was construed as offering a reward because it sought to induce performance, unlike an invitation to negotiate, which seeks a reciprocal promise. As Lord Justice Lindley explained, "advertisements offering rewards ... are offers to anybody who performs the conditions named in the advertisement, and anybody who does perform the condition accepts the offer." *Id.* at 262; *see also id.* at 268 (Bowen, L.J.).[9] Because Mrs. Carlill had complied with the terms of the offer, yet

---

8. Although the Court of Appeals's opinion is silent as to exactly what a carbolic smoke ball was, the historical record reveals it to have been a compressible hollow ball, about the size of an apple or orange, with a small opening covered by some porous material such as silk or gauze. The ball was partially filled with carbolic acid in powder form. When the ball was squeezed, the powder would be forced through the opening as a small cloud

of smoke. *See* Simpson, *supra*, at 262–63. At the time, carbolic acid was considered fatal if consumed in more than small amounts. *See id.* at 264.

9. *Carbolic Smoke Ball* includes a classic formulation of this principle: "If I advertise to the world that my dog is lost, and that anybody who brings the dog to a particular place will be paid some money, are all the police or

contracted influenza, she was entitled to £ 100.

Like *Carbolic Smoke Ball,* the decisions relied upon by plaintiff involve offers of reward. In *Barnes v. Treece,* 15 Wash. App. 437, 549 P.2d 1152 (1976), for example, the vice-president of a punchboard distributor, in the course of hearings before the Washington State Gambling Commission, asserted that, " 'I'll put a hundred thousand dollars to anyone to find a crooked board. If they find it, I'll pay it.' " *Id.* at 1154. Plaintiff, a former bartender, heard of the offer and located two crooked punchboards. Defendant, after reiterating that the offer was serious, providing plaintiff with a receipt for the punchboard on company stationery, and assuring plaintiff that the reward was being held in escrow, nevertheless repudiated the offer. *See id.* at 1154. The court ruled that the offer was valid and that plaintiff was entitled to his reward. *See id.* at 1155. The plaintiff in this case also cites cases involving prizes for skill (or luck) in the game of golf. *See Las Vegas Hacienda v. Gibson,* 77 Nev. 25, 359 P.2d 85 (1961) (awarding $5,000 to plaintiff, who successfully shot a hole-in-one); *see also Grove v. Charbonneau Buick–Pontiac, Inc.,* 240 N.W.2d 853 (N.D. 1976) (awarding automobile to plaintiff, who successfully shot a hole-in-one).

Other "reward" cases underscore the distinction between typical advertisements, in which the alleged offer is merely an invitation to negotiate for purchase of commercial goods, and promises of reward, in which the alleged offer is intended to induce a potential offeree to perform a specific action, often for noncommercial reasons. In *Newman v. Schiff,* 778 F.2d 460 (8th Cir.1985), for example, the Fifth Circuit held that a tax protestor's assertion that, "If anybody calls this show … and cites any section of the code that says an individual is required to file a tax return,

I'll pay them $100,000," would have been an enforceable offer had the plaintiff called the television show to claim the reward while the tax protestor was appearing. *See id.* at 466–67. The court noted that, like *Carbolic Smoke Ball,* the case "concerns a special type of offer: an offer for a reward." *Id.* at 465. *James v. Turilli,* 473 S.W.2d 757 (Mo.Ct.App.1971), arose from a boast by defendant that the "notorious Missouri desperado" Jesse James had not been killed in 1882, as portrayed in song and legend, but had lived under the alias "J. Frank Dalton" at the "Jesse James Museum" operated by none other than defendant. Defendant offered $10,000 "to anyone who could prove me wrong." *See id.* at 758–59. The widow of the outlaw's son demonstrated, at trial, that the outlaw had in fact been killed in 1882. On appeal, the court held that defendant should be liable to pay the amount offered. *See id.* at 762; *see also Mears v. Nationwide Mutual Ins. Co.,* 91 F.3d 1118, 1122–23 (8th Cir.1996) (plaintiff entitled to cost of two Mercedes as reward for coining slogan for insurance company).

In the present case, the Harrier Jet commercial did not direct that anyone who appeared at Pepsi headquarters with 7,000,000 Pepsi Points on the Fourth of July would receive a Harrier Jet. Instead, the commercial urged consumers to accumulate Pepsi Points and to refer to the Catalog to determine how they could redeem their Pepsi Points. The commercial sought a reciprocal promise, expressed through acceptance of, and compliance with, the terms of the Order Form. As noted previously, the Catalog contains no mention of the Harrier Jet. Plaintiff states that he "noted that the Harrier Jet was not among the items described in the catalog, but this did not affect [his] understanding of the offer." (Pl. Mem. at 4.) It should have.[10]

---

other persons whose business it is to find lost dogs to be expected to sit down and write a note saying that they have accepted my proposal?" *Carbolic Smoke Ball,* 1 Q.B. at 270 (Bowen, L.J.).

**10.** In his affidavit, plaintiff places great emphasis on a press release written by defendant, which characterizes the Harrier Jet as "the ultimate Pepsi Stuff award." (*See* Leonard Aff. ¶ 13.) Plaintiff simply ignores the remainder of the release, which makes no

*Carbolic Smoke Ball* itself draws a distinction between the offer of reward in that case, and typical advertisements, which are merely offers to negotiate. As Lord Justice Bowen explains:

> It is an offer to become liable to any one who, before it is retracted, performs the condition.... It is not like cases in which you offer to negotiate, or you issue advertisements that you have got a stock of books to sell, or houses to let, in which case there is no offer to be bound by any contract. Such advertisements are offers to negotiate—offers to receive offers—offers to chaffer, as, I think, some learned judge in one of the cases has said.

*Carbolic Smoke Ball,* 1 Q.B. at 268; *see also Lovett,* 207 N.Y.S. at 756 (distinguishing advertisements, as invitation to offer, from offers of reward made in advertisements, such as *Carbolic Smoke Ball* ). Because the alleged offer in this case was, at most, an advertisement to receive offers rather than an offer of reward, plaintiff cannot show that there was an offer made in the circumstances of this case.

C. *An Objective, Reasonable Person Would Not Have Considered the Commercial an Offer*

Plaintiff's understanding of the commercial as an offer must also be rejected because the Court finds that no objective person could reasonably have concluded that the commercial actually offered consumers a Harrier Jet.

1. *Objective Reasonable Person Standard*

■ In evaluating the commercial, the Court must not consider defendant's subjective intent in making the commercial, or plaintiff's subjective view of what the commercial offered, but what an objective, reasonable person would have understood the commercial to convey. *See Kay–R Elec. Corp. v. Stone & Webster Constr. Co.,* 23 F.3d 55, 57 (2d Cir.1994) ("[W]e are not

concerned with what was going through the heads of the parties at the time [of the alleged contract]. Rather, we are talking about the objective principles of contract law."); *Mesaros,* 845 F.2d at 1581 ("A basic rule of contracts holds that whether an offer has been made depends on the objective reasonableness of the alleged offeree's belief that the advertisement or solicitation was intended as an offer."); Farnsworth, *supra,* § 3.10, at 237; Williston, *supra,* § 4:7 at 296–97.

If it is clear that an offer was not serious, then no offer has been made:

> What kind of act creates a power of acceptance and is therefore an offer? It must be an expression of will or intention. It must be an act that leads the offeree reasonably to conclude that a power to create a contract is conferred. This applies to the content of the power as well as to the fact of its existence. *It is on this ground that we must exclude* invitations to deal or acts of mere preliminary negotiation, and *acts evidently done in jest* or without intent to create legal relations.

*Corbin on Contracts,* § 1.11 at 30 (emphasis added). An obvious joke, of course, would not give rise to a contract. *See, e.g., Graves v. Northern N.Y. Pub. Co.,* 260 A.D. 900, 22 N.Y.S.2d 537 (1940) (dismissing claim to offer of $1000, which appeared in the "joke column" of the newspaper, to any person who could provide a commonly available phone number). On the other hand, if there is no indication that the offer is "evidently in jest," and that an objective, reasonable person would find that the offer was serious, then there may be a valid offer. *See Barnes,* 549 P.2d at 1155 ("[I]f the jest is not apparent and a reasonable hearer would believe that an offer was being made, then the speaker risks the formation of a contract which was not intended."); *see also Lucy v. Zehmer,* 196 Va. 493, 84 S.E.2d 516, 518, 520 (1954)

mention of the Harrier Jet even as it sets forth in detail the number of points needed to re-

deem other merchandise.

(ordering specific performance of a contract to purchase a farm despite defendant's protestation that the transaction was done in jest as " 'just a bunch of two doggoned drunks bluffing' ").

2. *Necessity of a Jury Determination*

■ Plaintiff also contends that summary judgment is improper because the question of whether the commercial conveyed a sincere offer can be answered only by a jury. Relying on dictum from *Gallagher v. Delaney*, 139 F.3d 338 (2d Cir. 1998), plaintiff argues that a federal judge comes from a "narrow segment of the enormously broad American socio-economic spectrum," *id.* at 342, and, thus, that the question whether the commercial constituted a serious offer must be decided by a jury composed of, *inter alia,* members of the "Pepsi Generation," who are, as plaintiff puts it, "young, open to adventure, willing to do the unconventional." (*See* Leonard Aff. ¶ 2.) Plaintiff essentially argues that a federal judge would view his claim differently than fellow members of the "Pepsi Generation."

Plaintiff's argument that his claim must be put to a jury is without merit. *Gallagher* involved a claim of sexual harassment in which the defendant allegedly invited plaintiff to sit on his lap, gave her inappropriate Valentine's Day gifts, told her that "she brought out feelings that he had not had since he was sixteen," and "invited her to help him feed the ducks in the pond, since he was 'a bachelor for the evening.' " *Gallagher,* 139 F.3d at 344. The court concluded that a jury determination was particularly appropriate because a federal judge lacked "the current real-life experience required in interpreting subtle sexual dynamics of the workplace based on nuances, subtle perceptions, and implicit communications." *Id.* at 342. This case, in contrast, presents a question of whether there was an offer to enter into a contract, requiring the Court to determine how a reasonable, objective person would have understood defendant's commercial. Such an inquiry is commonly performed by courts on a motion for summary judgment. *See Krumme,* 143 F.3d at 83; *Bourque,* 42 F.3d at 708; *Wards Co.,* 761 F.2d at 120.

3. *Whether the Commercial Was "Evidently Done In Jest"*

■ Plaintiff's insistence that the commercial appears to be a serious offer requires the Court to explain why the commercial is funny. Explaining why a joke is funny is a daunting task; as the essayist E.B. White has remarked, "Humor can be dissected, as a frog can, but the thing dies in the process...." [11] The commercial is the embodiment of what defendant appropriately characterizes as "zany humor." (Def. Mem. at 18.)

First, the commercial suggests, as commercials often do, that use of the advertised product will transform what, for most youth, can be a fairly routine and ordinary experience. The military tattoo and stirring martial music, as well as the use of subtitles in a Courier font that scroll terse messages across the screen, such as "MONDAY 7:58 AM," evoke military and espionage thrillers. The implication of the commercial is that Pepsi Stuff merchandise will inject drama and moment into hitherto unexceptional lives. The commercial in this case thus makes the exaggerated claims similar to those of many television advertisements: that by consuming the featured clothing, car, beer, or potato chips, one will become attractive, stylish, desirable, and admired by all. A reasonable viewer would understand such advertisements as mere puffery, not as statements of fact, *see, e.g., Hubbard v. General Motors Corp.,* 95 Civ. 4362(AGS), 1996 WL 274018, at *6 (S.D.N.Y. May 22, 1996) (advertisement describing automobile as "Like a Rock," was mere puffery, not a warranty of quality); *Lovett,* 207 N.Y.S. at 756; and refrain from interpreting the promises of the commercial as being literally true.

Second, the callow youth featured in the commercial is a highly improbable pilot, one who could barely be trusted with the

11. *Quoted in* Gerald R. Ford, *Humor and the Presidency* 23 (1987).

keys to his parents' car, much less the prize aircraft of the United States Marine Corps. Rather than checking the fuel gauges on his aircraft, the teenager spends his precious preflight minutes preening. The youth's concern for his coiffure appears to extend to his flying without a helmet. Finally, the teenager's comment that flying a Harrier Jet to school "sure beats the bus" evinces an improbably insouciant attitude toward the relative difficulty and danger of piloting a fighter plane in a residential area, as opposed to taking public transportation.[12]

Third, the notion of traveling to school in a Harrier Jet is an exaggerated adolescent fantasy. In this commercial, the fantasy is underscored by how the teenager's schoolmates gape in admiration, ignoring their physics lesson. The force of the wind generated by the Harrier Jet blows off one teacher's clothes, literally defrocking an authority figure. As if to emphasize the fantastic quality of having a Harrier Jet arrive at school, the Jet lands next to a plebeian bike rack. This fantasy is, of course, extremely unrealistic. No school would provide landing space for a student's fighter jet, or condone the disruption the jet's use would cause.

Fourth, the primary mission of a Harrier Jet, according to the United States Marine Corps, is to "attack and destroy surface targets under day and night visual conditions." United States Marine Corps, Factfile: AV–8B Harrier II (last modified Dec. 5, 1995) <http://www.hqmc.usmc.mil /factfile.nsf>. Manufactured by McDonnell Douglas, the Harrier Jet played a significant role in the air offensive of Operation Desert Storm in 1991. *See id.* The jet is designed to carry a considerable armament load, including Sidewinder and Maverick missiles. *See id.* As one news report has noted, "Fully loaded, the Harrier can float like a butterfly and sting like a bee—albeit a roaring 14–ton butterfly and a bee with 9,200 pounds of bombs and missiles." Jerry Allegood, *Marines Rely on Harrier Jet, Despite Critics*, News & Observer (Raleigh), Nov. 4, 1990, at C1. In light of the Harrier Jet's well-documented function in attacking and destroying surface and air targets, armed reconnaissance and air interdiction, and offensive and defensive anti-aircraft warfare, depiction of such a jet as a way to get to school in the morning is clearly not serious even if, as plaintiff contends, the jet is capable of being acquired "in a form that eliminates [its] potential for military use." (*See* Leonard Aff. ¶ 20.)

Fifth, the number of Pepsi Points the commercial mentions as required to "purchase" the jet is 7,000,000. To amass that number of points, one would have to drink 7,000,000 Pepsis (or roughly 190 Pepsis a day for the next hundred years—an unlikely possibility), or one would have to purchase approximately $700,000 worth of Pepsi Points. The cost of a Harrier Jet is roughly $23 million dollars, a fact of which plaintiff was aware when he set out to gather the amount he believed necessary to accept the alleged offer. (*See* Affidavit of Michael E. McCabe, 96 Civ. 5320, Aug. 14, 1997, Exh. 6 (Leonard Business Plan).) Even if an objective, reasonable person were not aware of this fact, he would conclude that purchasing a fighter plane for $700,000 is a deal too good to be true.[13]

---

12. In this respect, the teenager of the advertisement contrasts with the distinguished figures who testified to the effectiveness of the Carbolic Smoke Ball, including the Duchess of Sutherland; the Earls of Wharncliffe, Westmoreland, Cadogan, and Leitrim; the Countesses Dudley, Pembroke, and Aberdeen; the Marchionesses of Bath and Conyngham; Sir Henry Acland, the physician to the Prince of Wales; and Sir James Paget, sergeant surgeon to Queen Victoria. *See* Simpson, *supra*, at 265.

13. In contrast, the advertisers of the Carbolic Smoke Ball emphasized their earnestness, stating in the advertisement that "£ 1,000 is deposited with the Alliance Bank, shewing our sincerity in the matter." *Carbolic Smoke Ball*, 1 Q.B. at 257. Similarly, in *Barnes*, the defendant's "subsequent statements, conduct, and the circumstances show an intent to lead any hearer to believe the statements were made seriously." *Barnes*, 549 P.2d at 1155. The offer in *Barnes*, moreover, was made in the serious forum of hearings before a state commission; not, as defendant states, at a

Plaintiff argues that a reasonable, objective person would have understood the commercial to make a serious offer of a Harrier Jet because there was "absolutely no distinction in the manner" (Pl. Mem. at 13,) in which the items in the commercial were presented. Plaintiff also relies upon a press release highlighting the promotional campaign, issued by defendant, in which "[n]o mention is made by [defendant] of humor, or anything of the sort." (*Id.* at 5.) These arguments suggest merely that the humor of the promotional campaign was tongue in cheek. Humor is not limited to what Justice Cardozo called "[t]he rough and boisterous joke … [that] evokes its own guffaws." *Murphy v. Steeplechase Amusement Co.,* 250 N.Y. 479, 483, 166 N.E. 173, 174 (1929). In light of the obvious absurdity of the commercial, the Court rejects plaintiff's argument that the commercial was not clearly in jest.

### 4. *Plaintiff's Demands for Additional Discovery*

 In his Memorandum of Law, and in letters to the Court, plaintiff argues that additional discovery is necessary on the issues of whether and how defendant reacted to plaintiff's "acceptance" of their "offer"; how defendant and its employees understood the commercial would be viewed, based on test-marketing the commercial or on their own opinions; and how other individuals actually responded to the commercial when it was aired. (*See* Pl. Mem. at 1–2; Letter of David E. Nachman to the Hon. Kimba M. Wood, Apr. 5, 1999.)

Plaintiff argues that additional discovery is necessary as to how defendant reacted to his "acceptance," suggesting that it is significant that defendant twice changed the commercial, the first time to increase the number of Pepsi Points required to purchase a Harrier Jet to 700,000,000, and then again to amend the commercial to state the 700,000,000 amount and add "(Just Kidding)." (*See* Pl. Stat. Exh C (700 Million), and Exh. D (700 Million— Just Kidding).) Plaintiff concludes that,

"Obviously, if PepsiCo truly believed that no one could take seriously the offer contained in the original ad that I saw, this change would have been totally unnecessary and superfluous." (Leonard Aff. ¶ 14.) The record does not suggest that the change in the amount of points is probative of the seriousness of the offer. The increase in the number of points needed to acquire a Harrier Jet may have been prompted less by the fear that reasonable people would demand Harrier Jets and more by the concern that unreasonable people would threaten frivolous litigation. Further discovery is unnecessary on the question of when and how the commercials changed because the question before the Court is whether the commercial that plaintiff saw and relied upon was an offer, not that any other commercial constituted an offer.

Plaintiff's demands for discovery relating to how defendant itself understood the offer are also unavailing. Such discovery would serve only to cast light on defendant's subjective intent in making the alleged offer, which is irrelevant to the question of whether an objective, reasonable person would have understood the commercial to be an offer. *See Kay–R Elec. Corp.,* 23 F.3d at 57 ("[W]e are not concerned with what was going through the heads of the parties at the time [of the alleged contract]."); *Mesaros,* 845 F.2d at 1581; *Corbin on Contracts,* § 1.11 at 30. Indeed, plaintiff repeatedly argues that defendant's subjective intent is irrelevant. (*See* Pl. Mem. at 5, 8, 13.)

Finally, plaintiff's assertion that he should be afforded an opportunity to determine whether other individuals also tried to accumulate enough Pepsi Points to "purchase" a Harrier Jet is unavailing. The possibility that there were other people who interpreted the commercial as an "offer" of a Harrier Jet does not render that belief any more or less reasonable. The alleged offer must be evaluated on its own terms. Having made the evaluation,

"gambling convention." *Compare Barnes,* 549 P.2d at 1154, *with* Def. Reply Mem. at 6.

the Court concludes that summary judgment is appropriate on the ground that no reasonable, objective person would have understood the commercial to be an offer.[14]

### D. The Alleged Contract Does Not Satisfy the Statute of Frauds

The absence of any writing setting forth the alleged contract in this case provides an entirely separate reason for granting summary judgment. Under the New York [15] Statute of Frauds,

> a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

N.Y.U.C.C. § 2–201(1); see also, e.g., AFP Imaging Corp. v. Philips Medizin Systeme, 92 Civ. 6211(LMM), 1994 WL 652510, at *4 (S.D.N.Y. Nov. 17, 1994). Without such a writing, plaintiff's claim must fail as a matter of law. See Hilord Chem. Corp. v. Ricoh Elecs., Inc., 875 F.2d 32, 36–37 (2d Cir.1989) ("The adequacy of a writing for Statute of Frauds purposes 'must be determined from the documents themselves, as a matter of law.' ") (quoting Bazak Int'l. Corp. v. Mast Indus., Inc., 73 N.Y.2d 113, 118, 538 N.Y.S.2d 503, 535 N.E.2d 633 (1989)).

■ There is simply no writing between the parties that evidences any transaction. Plaintiff argues that the commercial, plaintiff's completed Order Form, and perhaps other agreements signed by defendant which plaintiff has not yet seen, should suffice for Statute of Frauds pur-

poses, either singly or taken together. (See Pl. Mem. at 18–19.) For the latter claim, plaintiff relies on Crabtree v. Elizabeth Arden Sales Corp., 305 N.Y. 48, 110 N.E.2d 551 (1953). Crabtree held that a combination of signed and unsigned writings would satisfy the Statute of Frauds, "provided that they clearly refer to the same subject matter or transaction." Id. at 55, 110 N.E.2d 551. Yet the Second Circuit emphasized in Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8 (2d Cir.1989), that this rule "contains two strict threshold requirements." Id. at 11. First, the signed writing relied upon must by itself establish " 'a contractual relationship between the parties.' " Id. (quoting Crabtree, 305 N.Y. at 56, 110 N.E.2d 551); see also O'Keeffe v. Bry, 456 F.Supp. 822, 829 (S.D.N.Y.1978) ("To the extent that Crabtree permits the use of a 'confluence of memoranda,' the minimum condition for such use is the existence of one [signed] document establishing the basic, underlying contractual commitment."). The second threshold requirement is that the unsigned writing must " 'on its face refer to the same transaction as that set forth in the one that was signed.' " Horn & Hardart, 888 F.2d at 11 (quoting Crabtree, 305 N.Y. at 56, 110 N.E.2d 551); see also Bruce Realty Co. of Florida v. Berger, 327 F.Supp. 507, 510 (S.D.N.Y.1971).

■ None of the material relied upon by plaintiff meets either threshold requirement. The commercial is not a writing; plaintiff's completed order form does not bear the signature of defendant, or an agent thereof; and to the extent that plaintiff seeks discovery of any contracts between defendant and its advertisers, such discovery would be unavailing: plain-

---

**14.** Even if plaintiff were allowed discovery on all of these issues, such discovery would be relevant only to the second basis for the Court's opinion, that no reasonable person would have understood the commercial to be an offer. That discovery would not change the basic principle that an advertisement is not an offer, as set forth in Section II.B of this Order and Opinion, supra; nor would it affect the conclusion that the alleged offer failed to comply with the Statute of Frauds, as set forth in Section II.D, infra.

**15.** Having determined that defendant's advertisement was not an offer, the last act necessary to complete the contract would be defendant's acceptance in New York of plaintiff's Order Form. Thus the Court must apply New York law on the statute of frauds issue. See supra Section II.A.2.

tiff is not a party to, or a beneficiary of, any such contracts. Because the alleged contract does not meet the requirements of the Statute of Frauds, plaintiff has no claim for breach of contract or specific performance.

### E. *Plaintiff's Fraud Claim*

■ In addition to moving for summary judgment on plaintiff's claim for breach of contract, defendant has also moved for summary judgment on plaintiff's fraud claim. The elements of a cause of action for fraud are "'representation of a material existing fact, falsity, scienter, deception and injury.'" *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995) (quoting *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.,* 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833 (1958)).

■ To properly state a claim for fraud, "plaintiff must allege a misrepresentation or material omission by defendant, on which it relied, that induced plaintiff" to perform an act. *See NYU,* 639 N.Y.S.2d at 289, 662 N.E.2d 763. "General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support the claim." *See id.* (citing *Rocanova v. Equitable Life Assur. Soc'y,* 83 N.Y.2d 603, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994)); *see also Grappo v. Alitalia Linee Aeree Italiane, S.p.A.,* 56 F.3d 427, 434 (2d Cir.1995) ("A cause of action does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing it"). Instead, the plaintiff must show the misrepresentation was collateral, or served as an inducement, to a separate agreement between the parties. *See Bridgestone/Firestone v. Recovery Credit,* 98 F.3d 13, 20 (2d Cir.1996) (allowing a fraud claim where plaintiff "'demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract'") (quoting *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003 (1986)).

For example, in *Stewart v. Jackson & Nash,* 976 F.2d 86 (2d Cir.1992), the Second Circuit ruled that plaintiff had properly stated a claim for fraud. In the course of plaintiff's negotiations for employment with defendant, a law firm, defendant represented to plaintiff not only that plaintiff would be hired (which she was), but also that the firm had secured a large environmental law client, that it was in the process of establishing an environmental law department, and that plaintiff would head the environmental law department. *See id.* at 89–90. The Second Circuit concluded that these misrepresentations gave rise to a fraud claim, because they consisted of misrepresentations of present fact, rather than future promises.

■ Plaintiff in this case does not allege that he was induced to enter into a contract by some collateral misrepresentation, but rather that defendant never had any intention of making good on its "offer" of a Harrier Jet. (*See* Pl. Mem. at 23.) Because this claim "alleges only that the defendant entered into a contract with no intention of performing it," *Grappo,* 56 F.3d at 434, judgment on this claim should enter for defendant.

### III. *Conclusion*

In sum, there are three reasons why plaintiff's demand cannot prevail as a matter of law. First, the commercial was merely an advertisement, not a unilateral offer. Second, the tongue-in-cheek attitude of the commercial would not cause a reasonable person to conclude that a soft drink company would be giving away fighter planes as part of a promotion. Third, there is no writing between the parties sufficient to satisfy the Statute of Frauds.

For the reasons stated above, the Court grants defendant's motion for summary judgment. The Clerk of Court is instructed to close these cases. Any pending motions are moot.