**FRONTIER–KEMPER CONSTRUCTORS, INC., Flatiron Constructors, LLC d/b/a Frontier–Kemper/Flatiron, Joint Venture, Plaintiffs,**

v.

**AMERICAN ROCK SALT COMPANY, Defendant.**

**No. 01–CV–6217 CJS.**

United States District Court, W.D. New York.

Sept. 9, 2002.

J. William Ernstrom, Ernstrom & Dreste, LLP, Rochester, New York, Paul W. Killian, Akin, Gump, Strauss, Hauer & Field, LLP, Washington, D.C., for plaintiff.

Paul J. Yesawich, III, Harris, Beach & Wilcox, Pittsford, New York, for defendant.

## DECISION AND ORDER

SIRAGUSA, District Judge.

### INTRODUCTION

This is a diversity action for involving a construction contract. Now before the Court is Defendant's Motion to Dismiss the Amended Complaint [# 22], pursuant to Rules 12(b)(6), 8(a)(2), and 8(e)(1) of the Federal Rules of Civil Procedure. Also before the Court is plaintiff's application for an order to show cause [# 35] why defendant should not be found in contempt for violating an earlier Order of the Court. For the reasons that follow, defendant's motion to dismiss is granted in part and denied in part, and plaintiff's application for an order of contempt is denied.

### APPLICABLE STANDARDS

■ It is well settled that in determining a motion under Fed.R.Civ.P. 12(b)(6), a district court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *Burnette v. Carothers*, 192 F.3d 52, 56 (1999). While the Court must accept as true plaintiff's factual allegations, "[c]onclusory allegations of the legal status of the defendants' acts need not be accepted as true for the purposes of ruling on a motion to dismiss." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995) (*citing In re American Express Co. Shareholder Litig. (Lewis v. Robinson)*, 39 F.3d 395, 400–01 n. 3 (2d Cir.1994)). The Court "may dismiss the complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (internal quotations omitted) (*citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court's "consideration is limited to the factual allegations in plaintiff['s] ... complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992)).

■ Rule 8(a)(2) provides that a complaint shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(1) provides that "[e]ach averment of a pleading shall be simple, concise, and direct. No technical forms of pleading ... are required." The U.S. Supreme Court recently reaffirmed that "[t]he liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." *Swierkiewicz v. Sorema N.A.*,

534 U.S. 506, 122 S.Ct. 992, 998–99, 152 L.Ed.2d 1 (2002) (citation omitted). Under that system, a complaint is sufficient if it provides fair notice of the basis of the plaintiff's claims. *Id.*

## BACKGROUND

This action arises from a contract for the construction of the Hampton Corners Salt Mine Project in Mt. Morris, New York. Unless otherwise noted, the following facts are taken from the First Amended Complaint and the subject contract. Defendant American Rock Salt Company LLC ("ARSCo") is the owner of the Hampton Corners Salt Mine Project. Plaintiff Frontier–Kemper Constructors, Inc. and Flatiron Constructors LLC d/b/a Frontier–Kemper/Flatiron Joint Venture ("Frontier–Kemper"), is the contractor with whom defendant contracted to build the mine. On October 30, 1998, the parties signed a construction contract, which they agreed would be enforced in accordance with the laws of the State of New York.[1] In the contract, defendant agreed to pay plaintiff $70,649,000, provided that plaintiff completed the project within twenty-five months.[2] However, the contract required plaintiff to pay defendant up to $3 million in liquidated damages if certain milestones were not met, in amounts ranging from $15,000 to $21,000 for every day the project was late. Disputes arose, and defendant eventually withheld the full $3 million from plaintiff's progress payments.[3] In this action, plaintiff seeks rescission of the contract, compensation in *quantum meruit* in excess of twenty seven million dollars, and punitive damages of at least ten million dollars. Plaintiff contends that rescission of the contract is warranted on several different grounds, namely, fraud in the inducement, fraud during performance of the contract, mutual and/or unilateral mistakes of material fact, and material breaches of the contract by defendant. Plaintiff also seeks a declaratory judgment that it is entitled to abandon any additional performance of the contract.

On December 5, 2001, defendant filed the subject motion to dismiss the amended complaint. Plaintiff subsequently filed a cross-motion for an order of contempt. Counsel for the parties appeared before the undersigned for oral argument on the subject applications on June 13, 2002. The Court has thoroughly considered the parties' submissions and the comments of counsel.

## ANALYSIS

*Plaintiff's Fraud Claims*

 Defendant contends that the various fraud claims must be dismissed since, they are actually nothing more than claims for breach of contract. To prove fraud under the law of New York, which the

---

1. Article One of the contract indicates that the "contract documents" shall consist of three separate documents: 1) the contract itself; 2) the general conditions of the contract, attached as Exhibit F to the contract; and 3) the job specification, attached as Exhibit G to the contract. The job specification consists of 1,240 pages of drawings and specifications. Subparagraph 1.1 of the contract indicates that the contract, the general conditions of the contract, and the job specification, collectively referred to as the contract documents, "constitute the entire contract between the parties."

2. Plus an additional twenty days for shaft wall drying and grouting.

3. In a separate action, *American Rock Salt Co., LLC v. Frontier–Kemper Constructors, Inc., et al.,* 01–CV–6615 (CJS), defendant is suing plaintiff and several other parties for additional damages.

parties agree applies in this action,[4] "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19 (2d Cir.1996). Cases alleging fraud in connection with a contract dispute, however, are not necessarily actionable, under the well-settled principle that,

> where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract. In other words, simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim.[5]

*Telecom Int'l America, Ltd. v. AT & T Corp.*, 280 F.3d 175, 196 (2d Cir.2001) (citations and internal quotations omitted). This principle is, by its own terms, applicable only to the situation in which a plaintiff attempts to pass off as fraud what is nothing more than a breach of contract. However, it does not bar claims for true cases of fraud, as the Second Circuit noted in *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir.1995):

> A cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing. A fraud action *is* permitted, however, where the plaintiff alleges that the defendant engaged in other fraudulent conduct besides entering the contract with no intention to perform.

56 F.3d at 434 (emphasis in original).

In *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957), the New York Court of Appeals blurred the distinction between these two situations, holding that, "[w]hile mere promissory statements as to what will be done in the future are not actionable, it is settled that, if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a material existing fact upon which an action for rescission may be predicated." *Id.* at 160, 164 N.Y.S.2d 714, 143 N.E.2d 906 (citations and internal quotations omitted).[6] *Sabo's* holding seemingly would allow plaintiffs to "dress up" breach of contract claims as fraud claims,

---

**4.** Since the parties agree that the law of New York State should be applied to this diversity action, the Court need not perform its own analysis as to which state's law should be applied. *See, Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 203 n. 7 (2d cir.1998).

**5.** "The rationale for this rule is that a party need not be expressing an unconditional intention to perform by contracting, and may instead be expressing an intention either to perform or suffer the ordinary contractual consequences for a breach." *VTech Holdings Ltd. v. Lucent Technologies, Inc.*, 172 F.Supp.2d 435, 439 (S.D.N.Y.2001) (*citing*

*Briefstein v. P.J. Rotondo Constr. Co.*, 8 A.D.2d 349, 187 N.Y.S.2d 866, 868 (1st Dept.1959)); *see also, Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 434 (2d Cir.1995) (citing *Briefstein;* other citations omitted).

**6.** The Second Circuit followed *Sabo's* holding in *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 575 (2d Cir.1969), as did the New York Court of Appeals in *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.S.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986).

merely by alleging that the defendant never intended to perform the contract.[7] Whether for this reason or for some other, it does not appear that *Sabo* was widely followed by the lower New York courts, or by the courts of this Circuit. *See, e.g., Rolls–Royce Motor Cars, Inc. v. Schudroff,* 929 F.Supp. 117 (S.D.N.Y.1996) ("*Sabo* relies on the slippery distinction between a misrepresentation of present fact and a misrepresentation of future intent.... Understandably, courts at times have been vexed by the *Sabo* distinction.") (citations and internal quotations omitted).

In *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13 (2d Cir.1996), the Second Circuit Court of Appeals essentially declined to follow *Sabo,* and instead followed decisions of the New York Supreme Court, Appellate Division, which held that intentionally false statements indicating an intent to perform under a contract, by themselves, are "not sufficient to support a claim of fraud under New York law." *Id.* at 19. *Bridgestone/Firestone* further holds that, to maintain a claim of fraud relating to a contract,

> a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.

98 F.3d at 20.

■■■ Fraudulent misrepresentations, of course, can consist of either promises to do something in the future, or misstatements of present fact. With regard to future promises, after *Bridgestone/Firestone* it is clear that in order to be considered "collateral," the promise must be a promise to do something other than what is expressly required by the contract. *Hudson Optical Corp. v. Cabot Safety Corp.,* 971 F.Supp. 108, 109 (E.D.N.Y. 1997), *aff'd,* 162 F.3d 1148 (2d Cir.1998). With regard to misstatements of present fact, the New York courts and the courts in this Circuit generally agree that actions for fraudulent inducement are not barred, although they do not always agree on where such statements fit within the *Bridgestone/Firestone* framework.

For example, in *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995), the New York Court of Appeals held that fraudulent inducement of a contract is a tort which involves the breach of a legal duty separate from the duty to perform under the contract, which would fall under prong (i) of the *Bridgestone/Firestone* test. Other cases also indicate that misstatements of fact which induce a contract are actionable under prong (i) of the *Bridgestone/Firestone* test, without regard to whether or not they pertain to collateral matters. *See, Leonard v. Pepsico, Inc.,* 88 F.Supp.2d 116, 132 (S.D.N.Y.1999) ("[T]he plaintiff must show the misrepresentation was collateral, *or* served as an inducement, to a separate agreement between the parties.") (emphasis added, citations omitted), *aff'd,* 210 F.3d 88 (2d Cir.2000); *see also, International Cabletel Inc. v. Le Groupe Videotron Ltee,* 978 F.Supp. 483, 491 (S.D.N.Y.1997) (Holding that "fraud in the inducement can be supported by a false statement of present fact, *or* by a false statement of future intent which concerns a matter collateral to a contract between the parties.") (emphasis added); *accord,*

---

7. Of course, the plaintiff would have to plead the alleged fraud with sufficient particularity to satisfy Fed.R.Civ.P. 9(b),

*Four Finger Art Factory, Inc. v. Dinicola,* No. 99 Civ. 1259(JGK), 2001 WL 21248 at *3 (S.D.N.Y. Jan.9, 2001); *Ohio Players, Inc. v. Polygram Records, Inc.,* No. 99Civ.0033, 2000 WL 1616999 at *3 (S.D.N.Y. Oct.27, 2000); *Sony Music Entertainment Inc. v. Robison,* No. 01 CIV. 6415(LMM), 2002 WL 272406 at *2 (S.D.N.Y. Feb.26, 2002); *see also, Wuhan Airlines v. Air Alaska, Inc.,* No. 97 Civ. 8924(JSR), 1998 WL 689957 at *4 (S.D.N.Y. Oct.2, 1998) (holding that the *Bridgestone/Firestone* "doctrine does not preclude, *inter alia,* fraud claims premised ... on fraudulent inducement ... *or* on a fraud collateral to the contract.") (emphasis added, citations omitted).

Some decisions, however, blur the distinction between collaterality and the breach of a separate legal duty. For instance, in *First Bank of the Americas v. Motor Car Funding, Inc.,* 257 A.D.2d 287, 690 N.Y.S.2d 17 (1st Dept.1999), the court held:

> A fraud claim should be dismissed as redundant when it merely restates a breach of contract claim, i.e., when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract. By contrast, a cause of action for fraud may be maintained where a plaintiff pleads a *breach of duty separate* from, or in addition to, a breach of the contract. For example, if a plaintiff alleges that it was induced to enter into a transaction because a defendant misrepresented material facts, the plaintiff has stated a claim for fraud even though the same circumstances also give rise to the plaintiff's breach of contract claim. Unlike a misrepresentation of future intent to perform, a misrepresentation of present facts is *collateral* to the contract (though it may have induced the plaintiff to sign the contract) *and therefore involves a separate breach of duty.*

257 A.D.2d at 291–92, 690 N.Y.S.2d at 21 (citations omitted). The foregoing language, with its references to both separate duty and collaterality, indicates that misstatements of fact which fraudulently induce a contract are actionable under either or both of prongs (i) and (ii) from the *Bridgestone/Firestone* test set forth above.

█ Thus, whether because they violate a legal duty separate from the duty to perform under the contract, or because they are collateral to the contract, or both, courts generally hold that misstatements of present fact which induce a contract are actionable as fraud. In sum, the Court finds that *Bridgestone/Firestone* did not affect the law pertaining to fraudulent inducement of a contract, other than to clarify that a plaintiff may not pursue such a claim merely by alleging that the defendant never intended to perform the contract. A plaintiff may, however, pursue a claim fraudulent inducement of a contract, based upon a misrepresentation of present fact, or upon a false promise to do something besides what is required by the contract.

█ Additionally, a plaintiff may pursue a claim for fraud if the defendant failed to disclose information, when it had a duty to disclose, which would also constitute the breach of another legal duty separate and apart from the duty to perform under the contract. As to that, it is well settled that,

> [u]nder New York law, omissions of material fact may rise to a level constituting fraud and serve as a basis for an action for money damages, or for rescission of a release. Before such omissions can be labeled fraudulent, however, there must be a showing that a duty of disclosure existed.

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n,* 731 F.2d 112,

123 (2d Cir.1984) (citations and internal quotations omitted). In that regard,

> New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Brass v. American Film Technologies, Inc.*, 987 F.2d at 150. (citations and internal quotations omitted). On the other hand, "[a] duty to speak cannot arise simply because two parties may have been on opposite sides of a bargaining table when a deal was struck between them, for under New York law the ancient rule of caveat emptor is still alive and well." *Id.* (citations omitted).

### The alleged fraud in the inducement

In the instant case, plaintiff alleges that defendant engaged in three types of fraudulent inducement. First, plaintiff contends that, during contract negotiations, defendant misrepresented the amount of financing it had available, in order to cause plaintiff to lower its price. Second, plaintiff alleges that defendant engaged in a fraudulent "bait and switch" scheme, by which it induced plaintiff to enter into the contract by assuring it that the salt mine would be built according to certain specifications, while knowing and intending that it would later abandon those specifications, demand that the salt mine be built in a much more costly fashion, and refuse to approve change orders which would allow for an increase in the contract price or an extension of plaintiff's time to perform. Third, plaintiff alleges that defendant withheld important information concerning problems at the site, which it knew at the time would prevent plaintiff from performing the contract within the time allotted under the contract.

### 1. Statements regarding defendant's finances

To understand plaintiff's fraud claims, it is necessary to note that plaintiff was not the first contractor hired to build the mine. Rather, in 1997, defendant hired the Guy F. Atkinson Company ("Atkinson") to design a proposed version of the Hampton Corners Salt Mine. Atkinson submitted a bid with a target price of $75,580,897, with a cost not to exceed $84,226,484. Atkinson's proposal, however, also indicated that the cost could increase by as much as two million dollars in the event that a problem developed with ground water seeping into the mine shaft. Accordingly, Atkinson indicated that price to complete the mine could run as high as $86,360,684. In July, 1997, with its lender's approval, defendant accepted Atkinson's proposal. However, before Atkinson could begin work on the mine, its parent company filed for bankruptcy and defendant's lender withdrew its support for the project.

Subsequently, defendant contacted the plaintiff and solicited a bid to build the salt mine, noting that it was seeking "a cooperative partnering relationship between itself and the contractor that would build the mine." (Amended Complaint ¶ 77). At that time, defendant sent plaintiff a portion of Atkinson's designs, for use in preparing a bid. Based on Atkinson's designs, plaintiff submitted an initial bid of $66,838,000 for the project; however, this bid did not contain a guarantee regarding the mine's production capacity, nor did it assume that there would be any penalties

for late completion of the project. The parties then negotiated for approximately one year. During that time, defendant indicated that its available capital for the project was only $66 million. Plaintiff alleges that this statement was false, since defendant had already obtained financing of at least $85 million in connection with Atkinson's bid. The parties continued to negotiate and defendant made numerous substantial changes to the scope of the project. Eventually, plaintiff submitted a revised bid of $75,500,000. In response, defendant again indicated that plaintiff would have to reduce the bid in order for defendant to obtain financing. Thereafter, plaintiff reduced its bid to a base bid of $72,850,000 with an alternate bid of $73,950,000. Defendant subsequently indicated that plaintiff would have to lower its bid price even further to $69,000,000, and remove all conditions from the bid in order for the project to be financed. Plaintiff alleges that it agreed to "help defendant with its lender," by reducing its base bid to $70,649,000 and by removing all contingencies. In response, however, defendant insisted again that plaintiff reduce its bid to $69,000,000 in order for defendant to obtain its bank financing. Eventually, the parties agreed to a $70,649,000 contract price.

▆▆▆ The Court finds that defendant's statements regarding the amount of financing it had available are not actionable as fraud. The Court is not aware of, nor has plaintiff cited to, a single court decision, from any jurisdiction, in which a party to a contract negotiation was held liable for fraud because it misrepresented the amount it was willing or able to pay.

Plaintiff suggests that the parties had a quasi-fiduciary relationship, and that defendant therefore had a duty to be truthful about its finances, based on defendant's statement that it wanted to establish a "cooperative partnering relationship" with plaintiff. However, it is clear that the parties dealt at arm's length, and that defendant owed no such duty to plaintiff. Plaintiff fails to state a claim for fraud in any event, since it is clear that plaintiff did not, and could not have reasonably relied on defendant's assertion that it had only $66 million available, or that plaintiff would have to lower its bid to $69 million in order for the project to be financed. Rather, after defendant indicated that it had only $66 million available, plaintiff *increased* its bid to $75,500,000. Plaintiff later reduced its base bid to $72,850,000 with an alternate bid of $73,950,000. Moreover, defendant eventually agreed to pay $70,649,000, which was significantly more than it had previously claimed to have available. Plaintiff obviously knew, or should have known, therefore, that neither the $66 million nor the $69 million figure was accurate, and it cannot now claim to have been defrauded merely because it has subsequently learned that plaintiff could have paid more.[8] Accordingly, the fraud claim relating to statements defendant made while negotiating the contract price is dismissed with prejudice.

### 2. Statements regarding the scope of the work

▆▆▆ Plaintiff further contends that, during contract negotiations, defendant lied about how it wanted the mine built. For example, plaintiff contends defendant misrepresented the "run-of-mine", a term

---

**8.** As will be discussed further below, plaintiff's chief complaint in this action is clearly not with the price defendant agreed to pay, which plaintiff must have believed fair at the time, but rather, with the fact that defendant subsequently increased the scope of the work without making appropriate increases to the original contract price, as required by the contract.

which refers to the size of the salt particles to be produced. Based on the information that defendant provided, plaintiff designed a particular crushing and screening system, but after the contract was signed, defendant insisted upon a different run-of-mine. Similarly, plaintiff contends that, although it designed the mine's drainage system according to the plans defendant provided during contract negotiations, defendant insisted that plaintiff completely redesign the drainage system once the contract was signed. Plaintiff alleges that defendant similarly required the use of an expensive anti-corrosive paint, which it had previously deemed unnecessary, and changed the design of the mine's dust collection system and salt pad conveyor system. Plaintiff further contends that although it had included new ventilation fans and heaters in its initial bid, it removed those fans from the proposal and removed $765,000 from the bid price, because defendant indicated that it already owned fans and heaters that could be re-used in the new mine. However, in order to use those fans, plaintiff eventually had to redesign the ventilation and heating system. Similarly, plaintiff removed new chemical storage tanks from its bid, because defendant indicated that it already owned tanks . which could be utilized. However, those tanks turned out to be the wrong size, resulting in additional work and cost for plaintiff. As to both the fans/heaters and storage tanks, plaintiff alleges that defendant knew of the existing problems prior to entering the contract. In short, plaintiff alleges that defendant intentionally misrepresented that plaintiff's bid was acceptable, in order to cause plaintiff to agree to a reduced contract price. According to plaintiff, defendant never intended to compensate plaintiff for the additional work, and instead, intended to collect liquidated damages when plain-

tiff failed to meet its construction milestones.

The Court finds that these fraud claims must be dismissed, since they are essentially nothing more than claims for breach of contract which do not satisfy the *Bridgestone/Firestone* requirements. Plaintiff does not allege that defendant fraudulently promised to do something other than what it was required to do under the contract, i.e. a collateral promise, nor does it allege special damages that are unrecoverable as contract damages. Accordingly, plaintiff may only avoid dismissal if it has adequately pleaded that defendant made misstatements of fact which induced plaintiff to enter the contract, which the Court finds, as explained below, it has failed to do.

Looking first to the contract, it clearly gives defendant the unfettered right to unilaterally change the scope of the work plaintiff was to perform, "subject to applicable terms and conditions of the contract." (Contract, Art. 1.3.2). Changes in the scope of work to be performed is governed by Article 12 of the contract, which provides:

> [Defendant] shall have the right, without additional consent of [plaintiff], to: (i) Revise the JOB SPECIFICATION; (ii) Change elements of WORK already completed or being performed in accordance with the CONTRACT; (iii) Request additional work within the general scope of the WORK; (iv) Delete a part of WORK previously authorized; (iv) Require CONTRACTOR to provide engineering and construction studies and cost estimates related to a proposed CHANGE; and (vii) Require a change in the scheduling of any part of WORK. Should [defendant] exercise any right set forth in (i) through (vii) above, any adjustment to the CONTRACT PRICE

or PROJECT SCHEDULE shall be determined pursuant to Article 12.3 below. (Contract, Art. 12.1.1). Article 12.3, in turn, provides:

> Whenever [defendant] proposes a CHANGE pursuant to Article 12.1.1 above ... [defendant] shall issue a CHANGE ORDER provided that either of the following criteria is satisfied: (i) [Plaintiff's] costs for performing the WORK is affected thereby; or (ii) The time required for performing the WORK is affected thereby. If either of the aforesaid criteria is satisfied, within fourteen (14) days of receipt of a written notice from [defendant], or such other longer period as [the parties] may mutually agree upon in any particular instance, [plaintiff] shall prepare for consideration by [defendant], a firm lump sum increase or decrease to the CONTRACT PRICE, together with an estimate of the effect on the PROJECT SCHEDULE. The lump sum estimate shall be prepared, except in those instances with respect to which the parties mutually agree upon a different basis of computation. After [the parties] agree on the effects, including the amount and nature, whether an increase or a decrease, of the adjustment of the CONTRACT PRICE and the amount and nature of the adjustment to the PROJECT SCHEDULE, [defendant] shall issue a CHANGE ORDER adjusting one or both of the aforesaid items.

(Contract, Art. 12.3). Moreover, the contract prohibits defendant from assessing liquidated damages against plaintiff for delays caused by defendant's change orders: "Due account shall be taken of any adjustment of the CONTRACT time for completion of the WORK as provided by written CHANGE ORDER." (Contract, ¶ 6.3). The contract also contains a dispute resolution provision, requiring that the parties initially attempt to resolve disputes informally between their respective project managers, or if that fails, through their respective Chief Executive Officers. The contract further provides that if the parties cannot resolve a dispute, "either party may request to refer the dispute to an independent mediator who is mutually acceptable to [the parties] for advice and non-binding mediation. Mediation is not required and shall not be a condition precedent to any legal proceeding." (Contract, Art. 15.1–15.3).

Plaintiff cannot maintain an action for fraudulent inducement simply because defendant exercised its right to change the scope of the work to be performed. In any event, plaintiff's actual complaint is not that defendant changed the scope of the work, but that it did not follow Article 12.3, that is, it refused to approve plaintiff's requests for additional payment and for additional time to perform. Presumably, defendant could have changed the scope of the project all it wanted, as long as it increased plaintiff's compensation and time to perform, and plaintiff would not have complained. Thus, plaintiff's claims are for breach of contract, and, as is clear from *Bridgestone/Firestone*, plaintiff cannot convert them to fraud claims merely by alleging that defendant never intended to follow the contract.

 Moreover, plaintiff's claims regarding the ventilation/heating fans and chemical storage tanks are directly contradicted by the contract itself. Paragraph 3.3 of the contract indicates that except for certain limited site engineering provided by defendant's engineer, and except for the information provided in the job specification, plaintiff "shall furnish the complete engineering for the PLANT." The contract further indicates that on the basis of the job specification provided by defendant, plaintiff

shall provide all necessary engineering mechanical details for *equipment,* structures, foundations, buildings and other items necessary to perform the WORK, including, but not limited to, *functional ability to meet the design requirements,* structural strength, flow distribution, and the like, *are part of the engineering and are the CONTRACTOR'S responsibility under the CONTRACT....* CONTRACTOR shall review the JOB SPECIFICATION and bring to ARSCo's attention any omissions, conflicts or discrepancies it discovers and request clarifications of any unclear portions thereof. *CONTRACTOR represents that it is familiar with all requirements for WORK and all matters that can affect its execution. CONTRACTOR agrees that it has, at EFFECTIVE DATE, of CONTRACT, all information necessary to commence and proceed with WORK.* CONTRACTOR shall advise ARSCo promptly in writing if additional information may become necessary for accomplishing WORK. *Failure of CONTRACTOR to acquaint itself of the available information or to request additional information shall not relieve it of its obligations under the CONTRACT. ARSCo assumes no responsibility for any interpretations made by CONTRACTOR of the information provided by ARSCo.*

(Contract, ¶¶ 3.3.1—3.3.2) (emphasis added). The contract further provides that,

[s]ubject to the Differing Site Conditions, Scope of Work and Changes provision of the CONTRACT, the cost of performing the WORK shall be at the sole risk of the [defendant] *who shall be deemed to have obtained all information and taken into account all circumstances which may affect the cost in establishing the CONTRACT PRICE.*

(Id., ¶ 7.4) (emphasis added). Thus, according to the express terms of the contract, which was negotiated over the course of a year, plaintiff had an affirmative duty to determine whether or not defendant's old fans and storage tanks could be used in the construction of the new mine. Further, it was plaintiff's responsibility to inform defendant whether or not the fans and tanks could be used, not the other way around. Moreover, while plaintiff now claims that it relied on defendant's representations regarding the fans and storage tanks, it expressly denied any such reliance at the time it signed the contract. Therefore, plaintiff cannot claim that it was fraudulently induced to enter the contract based on defendant's opinion as to whether or not the fans and tanks were usable.

### 3. Failure to disclose likely delays

■ Additionally, plaintiff contends that prior to entering the contract, defendant knew of, but failed to disclose, factors which were likely to delay plaintiff's performance, making it impossible for plaintiff to complete the project in a timely manner, and thereby entitling defendant to liquidated damages. For example, plaintiff alleges that defendant misrepresented the amount of time that would be needed to investigate whether or not the mine was being built upon a Native American burial ground, which resulted in significant delays and additional work, as plaintiff and its subcontractors attempted to "work around" the archaeological sites. Plaintiff maintains that defendant also withheld information regarding the amount of time and work that would be needed to construct an access road to the mine, known as New York State Highway 63. Plaintiff further contends that defendant and its engineering firm delayed in obtaining necessary approvals for the design of Highway 63 from the New York

State Department of Transportation ("NY-DOT"), thereby preventing plaintiff from completing its work deadline.

As previously discussed, a party to a contract has a duty to disclose information in the following situations: 1) where it has made a partial or ambiguous statement; 2) where there is a fiduciary relationship; or 3) where it possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge. Plaintiff does not claim that the first of these three situations applies, and, as the Court found above, the second also does not apply, since the parties did not have a fiduciary relationship. *See, Brass v. American Film Technologies, Inc.*, 987 F.2d at 151 ("There is no reason to expand the class of informal fiduciary relationships to include ... parties participating in ... an arms-length transaction."). The Court will therefore focus its inquiry on the third situation described above.

As to that, the Court finds that the amended complaint does not adequately plead that defendant possessed superior knowledge that delays were likely to occur, which it failed to disclose to plaintiff. First, the Amended Complaint does not suggest that plaintiff has any factual basis for alleging that defendant knew, prior to executing the contract, that the archaeological examination would be delayed. Instead, plaintiff merely alleges, in conclusory fashion, and based only upon information and belief, that defendant was aware "of the distinct possibility that Native American burial remains would be found.") (Amended Complaint, ¶ 232) (emphasis added). Plaintiff bases this assumption upon the fact that, years earlier, during the time in which defendant's employee Larry Milliken had been employed by the property's former owner, the former owner received protests, when it attempted to build a mine, from "Native Americans and others who feared that the new mine might be located on an ancient burial site." (Amended Complaint, ¶ 39). However, plaintiff admits that the former owner obtained all necessary approvals to build the mine in 1996. (*Id.*, ¶ 40). Accordingly, the Amended Complaint does not explain why defendant should have known, prior to executing the contract, that a new archaeological investigation would result in significant delays. Plaintiff does not allege that the site actually *was* a Native American burial site, and in fact, the Amended Complaint does not explain, or allege, the exact reason why the archaeological testing took longer than anticipated. Therefore, the Court finds that plaintiff has failed to state a claim for fraud. Instead, plaintiff's allegations are for breach of contract, since, according to the amended complaint, "the contract schedule ... allowed 10 days for 'Archaeological Site Investigation.' " (Amended Complaint, ¶ 223). If, as plaintiff maintains, defendant exceeded that time limit, then plaintiff's remedy is for breach of contract.

Similarly, plaintiff has failed to plead fraudulent inducement with regard to the Highway 63 delays. The sole basis for this alleged instance of fraud is a statement made to Larry Milliken by the NY-DOT in 1997, that the size of the drainage culverts shown on the former owner's engineering plans "could be increased." (*See*, Amended Complaint, ¶ 243: "Significantly, Milliken was advised at this meeting that culvert sizes (for drainage) could be increased."). Plaintiff claims that, based upon this cryptic statement, defendant should have known that in February 1999, subsequent to the October 1998 execution of the contract, that the NYDOT would find "substantial problems" with defendant's engineering firm's proposed

storm water grading designs. The Court disagrees. Moreover, it is clear from the Amended Complaint that plaintiff was aware of the potential for additional work on Highway 63 prior to signing the contract. Plaintiff admits that in June 1998, defendant acknowledged in writing that it "could not predict" what the NYDOT might require, and plaintiff later informed defendant that its bid did not include "any cost or time for the Highway 63 additional upgrade work *should it be ordered by the NYDOT.*" (Amended Complaint, ¶ 245) (emphasis added). Pursuant to Article 12 of the contract, any additional work which defendant needed done should have been dealt with by a contract change order. Therefore, the Court finds that these allegations do not state a claim for fraudulent concealment. Instead, the Court finds that the delays attributable to the Highway 63 construction are matters that are provided for in the contract, and therefore must be pursued, if at all, as claims for breach of contract.

*The alleged fraud during the performance of the contract*

■■■ Plaintiff also contends that defendant committed fraud during the performance of the contract. Specifically, plaintiff contends that defendant made fraudulent misrepresentations with regard to the purchase of insurance. As detailed above, the contract provides that plaintiff had a maximum exposure for liquidated damages of $3 million, in the event it failed to meet its milestones. Defendant, however, wanted the ability to able to recover a total of at least $7 million in liquidated damages, accordingly, the parties agreed that together, they would buy $7 million in liquidated damages insurance, which plaintiff would obtain through its insurance broker, and that defendant would reimburse plaintiff for the cost of obtaining the additional $4 million of in-

surance. Plaintiff contends that its insurance broker sent two separate invoices to defendant for the $7 million liquidated damages insurance. The initial one was an invoice for the first $3 million of insurance, showing a premium due of $256,250, and the second was an invoice for the next $4 million in coverage, showing a premium due of $215,250. Plaintiff contends that defendant hid the fact that there were two separate invoices, and fraudulently misrepresented that the invoice for $256,250 was for all $7 million of insurance. Further, plaintiff contends that defendant then reimbursed plaintiff for only a portion of the $256,250. As a result, plaintiff contends that the insurance company only issued liquidated damages coverage for $3 million since it only received a premium payment for that amount of coverage. Nonetheless, the plaintiff alleges that defendant fraudulently maintained that the insurance company was improperly refusing to issue the additional $4,000,000 in coverage and it convinced plaintiff to work together with defendant in attempting to force the insurance company to issue the entire $7 million policy. When this attempt failed, plaintiff claims then, defendant attempted to hold the plaintiff liable for failing to obtain the additional $4,000,000 in coverage. Plaintiff contends that defendant engaged in this fraudulent scheme in order to obtain the full $7,000,000 in liquidated damages insurance which plaintiff would not agree to provide.

The Court finds that these allegations do not state a claim for fraud. This is not a claim for fraudulent inducement, since defendant did not make the alleged misrepresentations until after the agreement was signed, nor are the alleged misrepresentations collateral to the agreement, since the liquidated damages insurance provision referred to is set forth in the contract. (Addendum, ¶ 4). Rather, this is a situation

where, after the contract was signed, the defendant allegedly made fraudulent statements that it was performing the contract, when it allegedly had breached the contract. In *Bridgestone/Firestone*, the Second Circuit held that such statements are not sufficient to state a claim for fraud under the law of New York. *Bridgestone/Firestone*, 98 F.3d at 20; *see also*, *John Paul Mitchell Systems v. Quality King Distributors, Inc.*, No. 99 Civ. 9905(SHS), 2001 WL 910405 at *5 (S.D.N.Y. Aug.13, 2001) ("Defendant's post-contractual statements to conceal the breach of contract are also not actionable because intentionally false statements to conceal a breach of contract do not give rise to an action for fraud.") (citations omitted). Therefore, plaintiff must pursue this claim as one for breach of contract, not fraud.[9]

*Mutual or Unilateral Mistake*

▬ Plaintiff contends that the contract should be rescinded on the grounds of both unilateral mistake occasioned by fraud, and mutual mistake. In this regard, it is well settled that, even where a contract appears clear and unambiguous on its face, a court may rescind the agreement "where it finds either mutual mistake or one party's unilateral mistake coupled with some fraud of the other party." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991) (citation and internal quotations omitted).

▬ As for the claim of unilateral mistake caused by fraud, plaintiff essentially repeats the same allegations of fraud discussed above, i.e., fraud pertaining to the scope of work to be performed and delays caused by archaeological testing and changes to the design of Highway 63.

(Plaintiff's Opposition Brief [# 27], pp. 26–28). As the Court found above, however, plaintiff has failed to plead fraud, and in any event, the parties clearly took factors such as changes in scope and delay into consideration when they drafted the agreement. Accordingly, there was neither fraud nor unilateral mistake.

▬ Turning now to plaintiff's claim of mutual mistake, it is clear that to state a claim for mutual mistake warranting rescission, the plaintiff must allege that the parties to the agreement "shared the same erroneous belief as to a material fact, and their acts did not in fact accomplish their mutual intent." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d at 46 (citations omitted); *see also*, *Leasco Corp. v. Taussig*, 473 F.2d 777, 781 (2d Cir.1972) ("[W]here both parties assume a certain state of facts to exist, and contract on the faith of that assumption, they can be relieved from their obligations if the assumption is erroneous.") (citations omitted). However, it is well settled that,

[t]o the extent that there is a term in a valid agreement that the risk as to the existence of an assumed state of facts is to be upon one of the contracting parties, there can be no rescission of the transaction for mistake as to such facts. In other words, in determining whether rescission is warranted in a given circumstance, there must be excluded from consideration mistakes as to matters which the contracting parties had in mind as possibilities and as to the existence of which they took the risk.

*Beecher v. Able*, 575 F.2d 1010, 1015 (2d Cir.1978) (citations and internal quotations omitted). As for its contentions of mutual

---

9. Counts I and II of the Amended Complaint, alleging fraud, seek punitive damages. Defendant claims that, as a matter of law, plaintiff cannot recover punitive damages. However, since the Court is dismissing Counts I and II, it need not address the issue of punitive damages.

mistake, plaintiff begins by alleging that unforeseen problems developed with respect to rock in the salt bed, and differing soil and water conditions, both on the surface and below ground at the mine's underground process gallery. More specifically, plaintiff indicates that it encountered rock where it had been anticipated that there was none, resulting in extra cost and time needed for construction of the mine. Plaintiff states that, although defendant subsequently agreed to increase the contract price somewhat, it refused to extend the time for performance. Moreover, plaintiff alleges that defendant subsequently assessed liquidated damages against plaintiff due to delays caused by the excavation of the rock. Similarly, plaintiff alleges that the conditions of the site on which it was to build the salt pad were not as originally expected, and that during the excavation of the salt pad, plaintiff discovered an artesian well and flowing sand, which created a quick-sand-like condition in the area. Plaintiff indicates that, again, defendant paid a portion of the increased cost but refused to extend the time for performance of the project overall. Finally, plaintiff alleges that archeological information and drawings which defendant provided during the contract negotiations did not accurately represent the condition of the process gallery floor, and that plaintiff eventually had to build a much more costly concrete foundation in the process gallery, without receiving additional compensation or additional time to complete the project.[10] However, the Court finds that the agreement took the foregoing possibilities into consideration. For example, paragraph 11.2 to the contract's General Conditions, entitled "Soil Information and Differing Site Conditions," states as follows:

[Defendant] shall supply CONTRACTOR with soils information as set forth in the JOB SPECIFICATION. CONTRACTOR shall obtain all necessary additional information to enable it to properly perform WORK and construct the PLANT. Notwithstanding the aforesaid, if actual site conditions (defined for these purposes as subsurface or latent physical conditions) encountered during the WORK differ materially from the conditions which can be reasonably inferred from soils reports and other information in the JOB SPECIFICATION, or information otherwise provided to the CONTRACTOR by [defendant], the CONTRACTOR shall promptly notify [defendant] in writing of such difference, and [defendant] shall forthwith investigate the site conditions.... Upon request by [defendant] in writing, the CONTRACTOR shall prepare an estimate of the impact of such difference on either the CONTRACT PRICE or PROJECT SCHEDULE, or both. Upon agreement of the impact of the aforesaid items, [defendant] shall, pursuant to Article 12 of the AGREEMENT, issue a CHANGE ORDER including any adjustments to the CONTRACT PRICE and PROJECT SCHEDULE.

Clearly, the types of problems which plaintiff now contends were unforeseen by either party were, in fact, contemplated by both and were provided for in the agreement. Moreover, as plaintiff admits, it was able to use the contract to obtain some additional payment from defendant for the additional work it claims to have performed. Once again, the crux of plaintiff's argument is not that the complained-of problems were unforeseen, but that defendant did not properly follow the contract

---

10. Plaintiff's brief clearly indicates that plaintiff is not alleging that defendant fraudulently misrepresented or concealed these conditions. (Plaintiff's Opposition Brief [# 27], p. 29).

provisions for granting plaintiff additional pay and additional time to perform. Plaintiff's proper remedy, therefore, is a claim for breach of contract.

### Breach of Contract

In Count V of the Amended Complaint, plaintiff alleges breach of contract, and seeks "rescission (i.e., termination) and/or reformation of the contract and payment in *quantum meruit* in an amount of at least $27 million, or in the alternative, damages for said breaches." Plaintiff contends that defendant has materially breached the contract in several respects. Specifically, plaintiff alleges defendant has wrongfully refused to pay monthly progress payments on several occasions since January, 2001, has interfered with plaintiff's timely performance of the project by hiring away plaintiff's employees, has wrongfully seized and withheld liquidated damages, has imposed unreasonable testing requirements, and has refused to issue certificates of completion for portions of the project which are in fact completed. Defendant has moved to dismiss plaintiff's demand for rescission/*quantum meruit*, on the grounds that those remedies are not available where, as here, there is a valid written agreement.

■ With regard to a plaintiff's ability to sue both for breach of contract and rescission/*quantum meruit*, in *Reilly v. Natwest Markets Group Inc.*, the Second Circuit Court of Appeals stated:

> Under New York law, the existence of an express contract governing a particular subject matter ordinarily precludes recovery in *quantum meruit* for events arising out of the same subject matter. New York courts, however, have recognized an exception to this general rule and have held that in some circumstances the non-breaching party may

timely rescind and seek recovery in *quantum meruit*.

181 F.3d 253, 262–63 (2d Cir.1999), *cert denied*, 528 U.S. 1119, 120 S.Ct. 940, 145 L.Ed.2d 818 (2000). The circumstances under which a plaintiff may elect to rescind an express contract are apparently few in number, as indicated by the Second Circuit's holding that, "a victim of a breach may not rescind in the absence of compelling equitable grounds." *Id.* at 263 (citation and internal quotation omitted). Such situations include instances where there has been a "failure of consideration, fraud in the inducement, inability to perform, or a breach that substantially defeats the purpose." *Id.* A plaintiff who wants to pursue recovery in *quantum meruit* must make a timely decision to rescind. Moreover, "[a]lthough a plaintiff may sometimes defer the election of remedies and seek damages from a jury on alternative theories of breach of contract and *quantum meruit*, this is only true where there is a dispute over the existence, scope, or enforceability of the putative contract." *Id.* (citations omitted).

■ In the instant case, plaintiff acknowledges that, in the ordinary case, it would not be able to pursue recovery in *quantum meruit*, because of the parties' express agreement. However, plaintiff contends that it may pursue *quantum meruit* for essentially three reasons, namely, because the contract was procured by fraud in the inducement, because the parties' disagree as to the contract's scope, and because the contract may not be enforceable. (Plaintiff's Opposition Brief [# 27], pp. 32–33). Plaintiff's first basis fails, since the Court has already dismissed the fraudulent inducement claim. As for the second basis, plaintiff cites to various paragraphs of the Amended Complaint, to

show that the parties disagree as to the contract's scope.[11] In those paragraphs, plaintiff merely cites those instances where defendant changed the scope the work, or where work was delayed due to the archaeological inspection. (Plaintiff's Opposition Brief [# 27], p. 33 n. 21). However, those incidents cast no doubt on the contract's scope. Rather, the parties expressly agreed that defendant had the right to unilaterally change the scope of the work, which it did. The disagreement is over how much money plaintiff should be paid for doing the work, and whether or not its time for performance should have been extended. Both of those issues are provided for in the contract.[12]

■ Plaintiff's contention that the Amended Complaint contract may not be enforceable is likewise baseless. In support of that argument, plaintiff cites paragraph 335 of the Amended Complaint, which merely states that, based upon the allegations of mistake, "the contract should be declared void or voidable." (Plaintiff's Opposition Brief [# 27], p. 33). However, the claims alleging fraud and mistake are being dismissed, and the Amended Complaint does not otherwise raise any bona fide issue as to the contract's enforceability. Accordingly, the Court finds that, with regard to Count V of the Amended Complaint alleging breach of contract, plaintiff may not obtain rescission and *quantum meruit*, but must instead seek contract damages.

*Sufficiency of the Complaint Under Fed. R.Civ.P. 8*

■ Plaintiff's original complaint was nineteen pages long with 117 numbered paragraphs. Defendant filed a motion to dismiss the original complaint, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, however, the parties subsequently agreed that defendant would withdraw its motion to dismiss and that plaintiff would file an amended complaint. Defendant now claims that the amended complaint, which is eighty-one pages long and contains three hundred forty five numbered paragraphs, is a "bloated, mind-numbing document which would be difficult, if not impossible, to answer." The Court disagrees, and finds that, although the complaint is lengthy, it is easily understood and provides fair notice of plaintiff's claims. Moreover, the length of the complaint is presumably attributable to defendant's earlier motion to dismiss pursuant to Fed.R.Civ.P. 9(b), and plaintiff's resultant attempt to state, with particularity, the facts underlying the fraud claims. *See, Swierkiewicz*, 122 S.Ct. at 998 ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions. Rule 9(b), for example, provides for greater particularity in all averments of fraud or mistake.")

*The Application to Find Defendant in Contempt*

■ By a separate application, brought on by an Order to Show Cause, plaintiff seeks an order of contempt

---

**11.** Plaintiff cites to the Amended Complaint, ¶¶ 215, 238, 239, and 240.

**12.** The case which plaintiff cites, *Callender v. Fieldman*, 252 A.D.2d 468, 469, 676 N.Y.S.2d 152, 153 (1st Dept.1998), is factually inapposite, since it dealt with a disagreement over the scope of an oral agreement. *Callender* is not helpful to plaintiff in any event, since it

holds that *quantum meruit* is only available where "there is a *bona fide* dispute as to the existence of a contract or where the contract does not cover the dispute in issue." *Id.* (emphasis added). Here, there is no such bona fide dispute as to the contract's existence, and the contract covers the disputed issues.

against defendant. It is well settled that a contempt order is

a potent weapon, to which courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct. A contempt order is warranted only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict. More specifically, a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.

*King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir.1995) (citations and internal quotations omitted); *see also, City of New York v. Local 28, Sheet Metal Workers Int'l Ass'n,* 170 F.3d 279, 282–83 (2d Cir. 1999) ("A party may be held in contempt only if it is proven by clear and convincing evidence that the party violated a clear and unambiguous order of the court. The violation need not be willful, but it must be demonstrated that the contemnor was not reasonably diligent in attempting to comply.") (citations and internal quotations omitted). A district court's ruling on such an application is reviewed for abuse of discretion. *City of New York v. Local 28, Sheet Metal Workers Int'l Ass'n,* 170 F.3d at 283.

The facts underlying this application are as follows. Plaintiff commenced this action on April 30, 2001, and the case was originally assigned to the Honorable Michael A. Telesca, United States District Judge.[13] Defendant thereafter filed a motion for an order pursuant to Rule 67 of the Federal Rules of Civil Procedure, for leave to deposit with the Clerk of the Court a progress payment in the amount

of $1,232,596.62 to be held by the Court pending the disposition of the action. Plaintiff then filed a cross-motion for an order compelling defendant to make payment of the $1,232,596.62 directly to plaintiff rather than depositing that sum with the Court. Rather than litigating these competing applications, the parties entered into a stipulation and consent order, which Judge Telesca signed on June 6, 2001, which states:

1. The parties agree to comply with the terms of their agreement dated October 30, 1998, including but not limited to Articles 9 and 15.4 thereof; and further agree (a) that the payment of the Current Progress Payment shall be made by ARSCo to plaintiffs within three (3) business days following execution of this Stipulation; and (b) that payment within said time period shall be deemed timely under the terms of the aforesaid agreement.

2. The parties agree that the Stipulation constitutes their joint application to the Court for a Consent Order incorporated in the Stipulation in its entirety and do further agree to abide by the terms thereof until further Order of this Court. Said Consent Order shall be deemed a resolution of the pending Motion and Cross–Motion here and above referred to, without prejudice to any party or amend a re-application thereon in the event that the other party has failed to comply herewith.

(Stipulation and Consent Order [# 8] ). Thereafter, although this litigation proceeded, plaintiff continued its work on the project and defendant continued to pay plaintiff's monthly invoices. Eventually, however, defendant refused, and continues

---

**13.** On January 14, 2002, this case was transferred to the undersigned.

to refuse, to pay two of plaintiff's invoices. They are invoice number 38, dated October 5, 2001, in the amount of $301,200.82, and invoice number 39, dated November 2, 2001, in the amount of $680,530,60.

On May 30, 2002, plaintiff applied for an order directing the defendant to show cause why it should not be held contempt for violating the aforementioned Stipulation and Consent Order. In support of that application, plaintiff indicates that pursuant to Article 9 of the contract, defendant was required to state any objections it had to the billing statements within twenty (20) days, and since it did not, it was required to make a payment within twenty (20) days, pursuant to the terms of the contract. Plaintiff further indicates that on December 14, 2001, defendant belatedly notified plaintiff that it did not intend to make the progress payments, and instead would take those monies as an offset under the contract. Further, plaintiff notes in its application that on October 29, 2001, it filed a mechanic's lien on the Hampton Corners mine in the amount of $29,218,285. In response, defendant contends that it is justified in refusing to pay the invoices for several reasons. Defendant contends, first, that plaintiff is not entitled to the two progress payments, since plaintiff did not submit lien waivers along with the requests for payment, as required by paragraph 9.2.2 of the contract. Defendant further indicates that it notified plaintiff that it would not process invoices 38 and 39 without the lien waivers. Additionally, defendant contends that it is not obligated to pay the invoices because plaintiff filed a $29,000,000 mechanic's lien against the project on October 29, 2001.

Defendant further indicates that it was justified in offsetting and withholding any additional payments to plaintiff pursuant to paragraph 9.2.6 of the contract, which provides that defendant shall have the right to set off or deduct from amounts owed to the contractor any sum which the defendant is required to deduct by law or which the contractor may owe to the defendant according to the provisions of the contract.

The Court pauses here to note that, pursuant to the Order to Show Cause [# 37], all papers pertaining to the contempt application were to be filed and served on or before June 10, 2002, at 12 p.m.[14] Prior to oral argument on June 13, 2002, plaintiff submitted no evidence that it had provided defendant with a lien waiver, pertaining to payment 37, along with invoice number 38, as it was admittedly required to do under the contract. At the close of oral argument, the Court asked defendant's counsel to submit a letter, indicating whether or not defendant would consider paying invoices 38 and 39 if plaintiff were to now submit the required lien waivers. On June 17, 2002, defendant submitted a three-page letter, indicating that it would not pay those invoices, even if plaintiff submitted lien waivers. On June 18, 2002, plaintiff's counsel made an oral request to submit a "brief response" to defendant's letter, which the Court granted. On June 20, 2002, plaintiff filed what is essentially a full-fledged reply brief, with various attached exhibits. Included as one of those exhibits is the affidavit of a John E. Heidish, former business manager for plaintiff, in which he claims to have sent a lien waiver pertaining to invoice 37 to defendant.[15] Heidish does not allege

---

14. In a letter to the Court and opposing counsel dated May 23, 2002, defendant's counsel requested to have until June 10, 2002 to respond to the contempt application. Defendant's letter further noted that plaintiff had not requested to serve reply papers, and plaintiff did not subsequently request to do so.

15. During oral argument on June 13, 2002, plaintiff's counsel stated that he believed a

that the lien waiver was sent to defendant along with invoice 38, as was the established procedure, but instead, states only that it was sent to defendant at some point "in October 2001." Heidish did not provide a photocopy of an executed lien waiver, but instead, submitted an unexecuted document, purportedly a copy of a lien waiver sent to defendant in October 2001, as well as an executed lien waiver, not signed by Heidish until June 19, 2002. Moreover, although Heidish claims to have sent both an original and a copy of the lien waiver to defendant in October 2001, he did not produce the transmittal letter which presumably would have accompanied the waiver.

■ Based upon all of the foregoing, the Court will not consider plaintiff's reply brief on the merits of the contempt application, since it was filed outside the briefing schedule. Plaintiff made no request to submit reply papers prior to oral argument, even though it was clear on June 10th at the latest, when defendant filed its response, that the existence or non-existence of the lien waiver pertaining to payment 37 was a vitally important issue in this case. Plaintiff has not attempted to explain why it waited until a week after oral argument to attempt to submit proof that such a lien waiver exists. Finally, the Court notes that it will also not consider defendant's June 17th letter with regard to the merits of the contempt application. When the Court asked defendant to submit the letter, it merely wanted to know whether or not there was a possibility of resolving plaintiff's application without the necessity of the Court issuing a decision.

Defendant answered that question in the negative, and the Court is frankly not concerned at this time with the reasons defendant gave for its decision.

■ Having thus clarified the evidence that it will consider, the Court finds that plaintiff is not entitled to the relief it seeks, since it has not proven that it complied with a condition precedent to payment. Specifically, article 9 of the contract provides that

[e]ach invoice submitted by the CONTRACTOR shall be accompanied by lien waiver(s) and written certification that all portions of the WORK covered in the invoice have been completed in accordance with the CONTRACT, and that CONTRACTOR has acquired title to all equipment and materials and such items are included in the invoice free and clear of all liens, claims, security interests or encumbrances of any kind, and that CONTRACTOR has paid for all labor utilized in the engineering, procurement, construction and other services included in the invoice. Said lien waivers shall be in a form acceptable to Lender;

(Contract, ¶ 9.2.2). According to sworn statements submitted by defendant, plaintiff was required to submit, along with its invoices, a lien waiver for the prior payment. In other words, plaintiff was required to submit a lien waiver for payment number 37 along with its invoice for payment number 38, and a lien waiver for payment number 38 along with its invoice for payment number 39. Defendant maintains that plaintiff did not submit a lien waiver with either invoice.[16] Plaintiff

---

waiver had been sent, but he provided no evidence to that effect. The affidavit from Heidish was not executed until June 19, 2002, six days later.

**16.** Payment number 37 was in the amount of $213,318.90, and defendant, in a sworn state-

ment, indicates that it never received a lien waiver pertaining to that payment. Since defendant did not pay invoice 38, plaintiff could not have submitted a lien waiver with invoice 39.

made no mention of the lien-waiver requirement in its moving papers, nor, upon receiving defendant's papers, did it seek to supplement its papers prior to the close of the briefing schedule. Accordingly, plaintiff has not demonstrated, by clear and convincing evidence, that defendant violated either the terms of the contract or the terms of the stipulated order dated June 6, 2001.

## CONCLUSION

For all of the foregoing reasons, defendant's motion to dismiss the amended complaint [# 22] is granted in part and denied in part. Counts I, II, III, and IV of the Amended Complaint are dismissed with prejudice, pursuant to Fed.R.Civ.P. 12(b)(6). Count V, plaintiff's claim for breach of contract, may go forward, although the demand for rescission and payment in *quantum meruit* is dismissed. Plaintiff's claim for a declaratory judgment, Count VI of the Amended Complaint, may also go forward. Defendant's motion to dismiss pursuant to Fed.R.Civ.P. 8 is denied. Plaintiff's cross-motion [# 35] for an order of contempt is denied.

SO ORDERED.